# FEDERAL POWER COMMISSION ET AL. *v.* HOPE NATURAL GAS CO.

NO. 34.

Argued October 20, 21, 1943.—Decided January 3, 1944.

*Assistant Attorney General Shea,* with whom *Solicitor General Fahy* and *Messrs. Paul A. Freund, K. Norman*

*Diamond, Melvin Richter, Charles V. Shannon, Milford Springer, A. F. O'Neil, Clyde B. MacDonald, Harold A. Scragg,* and *Samuel Graff Miller* were on the brief, for petitioners in No. 34; and *Mr. Spencer W. Reeder,* with whom *Messrs. Robert E. May* and *Robert M. Morgan* were on the brief, for petitioner in No. 35.

*Mr. William B. Cockley,* with whom *Messrs. Walter J. Milde* and *William A. Dougherty* were on the brief, for respondent.

By Special leave of Court, *Mr. M. M. Neely,* Governor of West Virginia, with whom *Messrs. Ira J. Partlow,* Assistant Attorney General, and *W. W. Goldsmith* were on the brief, for the State of West Virginia, as *amicus curiae,* urging affirmance.

Briefs of *amici curiae* were filed by *Mr. Gay H. Brown,* on behalf of the Public Service Commission of New York, and *Messrs. John E. Benton* and *Frederick G. Hamley,* on behalf of the National Association of Railroad and Utilities Commissioners, in No. 34, urging reversal; and by *Messrs. Donald C. McCreery* and *Robert D. Garver,* on behalf of the Cities Service Gas Co., in Nos. 34 and 35, urging affirmance.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The primary issue in these cases concerns the validity under the Natural Gas Act of 1938 (52 Stat. 821, 15 U. S. C. § 717) of a rate order issued by the Federal Power Commission reducing the rates chargeable by Hope Natural Gas Co., 44 P. U. R. (N. S.) 1. On a petition for review of the order made pursuant to § 19 (b) of the Act, the

594

Circuit Court of Appeals set it aside, one judge dissenting. 134 F. 2d 287. The cases are here on petitions for writs of certiorari which we granted because of the public importance of the questions presented.

Hope is a West Virginia corporation organized in 1898. It is a wholly owned subsidiary of Standard Oil Co. (N. J.). Since the date of its organization, it has been in the business of producing, purchasing and marketing natural gas in that state.[1] It sells some of that gas to local consumers in West Virginia. But the great bulk of it goes to five customer companies which receive it at the West Virginia line and distribute it in Ohio and in Pennsylvania.[2] In July 1938 the cities of Cleveland and Akron filed complaints with the Commission charging that the rates collected by Hope from East Ohio Gas Co. (an affiliate of Hope which distributes gas in Ohio) were excessive and unreasonable. Later in 1938 the Commission on its own motion instituted an investigation to determine the reasonableness of all of Hope's interstate rates. In March

---

[1] Hope produces about one-third of its annual gas requirements and purchases the rest under some 300 contracts.

[2] These five companies are the East Ohio Gas Co., the Peoples Natural Gas Co., the River Gas Co., the Fayette County Gas Co., and the Manufacturers Light & Heat Co. The first three of these companies are, like Hope, subsidiaries of Standard Oil Co. (N. J.). East Ohio and River distribute gas in Ohio, the other three in Pennsylvania. Hope's approximate sales in m. c. f. for 1940 may be classified as follows:

| | |
|---|---:|
| Local West Virginia sales | 11,000,000 |
| East Ohio | 40,000,000 |
| Peoples | 10,000,000 |
| River | 400,000 |
| Fayette | 860,000 |
| Manufacturers | 2,000,000 |

Hope's natural gas is processed by Hope Construction & Refining Co., an affiliate, for the extraction of gasoline and butane. Domestic Coke Corp., another affiliate, sells coke-oven gas to Hope for boiler fuel.

1939 the Public Utility Commission of Pennsylvania filed a complaint with the Commission charging that the rates collected by Hope from Peoples Natural Gas. Co. (an affiliate of Hope distributing gas in Pennsylvania) and two non-affiliated companies were unreasonable. The City of Cleveland asked that the challenged rates be declared unlawful and that just and reasonable rates be determined from June 30, 1939 to the date of the Commission's order. The latter finding was requested in aid of state regulation and to afford the Public Utilities Commission of Ohio a proper basis for disposition of a fund collected by East Ohio under bond from Ohio consumers since June 30, 1939. The cases were consolidated and hearings were held.

On May 26, 1942, the Commission entered its order and made its findings. Its order required Hope to decrease its future interstate rates so as to reflect a reduction, on an annual basis, of not less than $3,609,857 in operating revenues. And it established "just and reasonable" average rates per m. c. f. for each of the five customer companies.[3] In response to the prayer of the City of Cleveland the Commission also made findings as to the lawfulness of past rates, although concededly it had no authority under the Act to fix past rates or to award reparations. 44 P. U. R. (N. S.) p. 34. It found that the rates collected by Hope from East Ohio were unjust, unreasonable, excessive and therefore unlawful, by $830,892 during 1939, $3,219,-551 during 1940, and $2,815,789 on an annual basis since 1940. It further found that just, reasonable, and lawful rates for gas sold by Hope to East Ohio for resale for ultimate public consumption were those required

[3] These required minimum reductions of 7¢ per m. c. f. from the 36.5¢ and 35.5¢ rates previously charged East Ohio and Peoples, respectively, and 3¢ per m. c. f. from the 31.5¢ rate previously charged Fayette and Manufacturers.

to produce $11,528,608 for 1939, $11,507,185 for 1940 and $11,910,947 annually since 1940.

The Commission established an interstate rate base of $33,712,526 which, it found, represented the "actual legitimate cost" of the company's interstate property less depletion and depreciation and plus unoperated acreage, working capital and future net capital additions. The Commission, beginning with book cost, made certain adjustments not necessary to relate here and found the "actual legitimate cost" of the plant in interstate service to be $51,957,416, as of December 31, 1940. It deducted accrued depletion and depreciation, which it found to be $22,328,016 on an "economic-service-life" basis. And it added $1,392,021 for future net capital additions, $566,105 for useful unoperated acreage, and $2,125,000 for working capital. It used 1940 as a test year to estimate future revenues and expenses. It allowed over $16,000,000 as annual operating expenses—about $1,300,000 for taxes, $1,460,000 for depletion and depreciation, $600,000 for exploration and development costs, $8,500,000 for gas purchased. The Commission allowed a net increase of $421,-160 over 1940 operating expenses, which amount was to take care of future increase in wages, in West Virginia property taxes, and in exploration and development costs. The total amount of deductions allowed from interstate revenues was $13,495,584.

Hope introduced evidence from which it estimated reproduction cost of the property at $97,000,000. It also presented a so-called trended "original cost" estimate which exceeded $105,000,000. The latter was designed "to indicate what the original cost of the property would have been if 1938 material and labor prices had prevailed throughout the whole period of the piecemeal construction of the company's property since 1898." 44 P. U. R. (N. S.), pp. 8–9. Hope estimated by the "per cent condition" method accrued depreciation at about 35% of

reproduction cost new. On that basis Hope contended for a rate base of $66,000,000. The Commission refused to place any reliance on reproduction cost new, saying that it was "not predicated upon facts" and was "too conjectural and illusory to be given any weight in these proceedings." *Id.*, p. 8. It likewise refused to give any "probative value" to trended "original cost" since it was "not founded in fact" but was "basically erroneous" and produced "irrational results." *Id.*, p. 9. In determining the amount of accrued depletion and depreciation the Commission, following *Lindheimer* v. *Illinois Bell Tel. Co.*, 292 U. S. 151, 167–169; *Federal Power Commission* v. *Natural Gas Pipeline Co.*, 315 U. S. 575, 592–593, based its computation on "actual legitimate cost." It found that Hope during the years when its business was not under regulation did not observe "sound depreciation and depletion practices" but "actually accumulated an excessive reserve" [4] of about $46,000,000. *Id.*, p. 18. One member of the Commission thought that the entire amount of the reserve should be deducted from "actual legitimate cost" in determining the rate base.[5] The majority of the

---

[4] The book reserve for interstate plant amounted at the end of 1938 to about $18,000,000 more than the amount determined by the Commission as the proper reserve requirement. The Commission also noted that "twice in the past the company has transferred amounts aggregating $7,500,000 from the depreciation and depletion reserve to surplus. When these latter adjustments are taken into account, the excess becomes $25,500,000, which has been exacted from the ratepayers over and above the amount required to cover the consumption of property in the service rendered and thus to keep the investment unimpaired." 44 P. U. R. (N. S.), p. 22.

[5] That contention was based on the fact that "every single dollar in the depreciation and depletion reserves" was taken "from gross operating revenues whose only source was the amounts charged customers in the past for natural gas. It is, therefore, a fact that the depreciation and depletion reserves have been contributed by the customers and do not represent any investment by Hope." *Id.*, p. 40. And see *Railroad Commission* v. *Cumberland Tel. & T. Co.*, 212 U. S. 414, 424–425; 2 Bonbright, Valuation of Property (1937), p. 1139.

Commission concluded, however, that where, as here, a business is brought under regulation for the first time and where incorrect depreciation and depletion practices have prevailed, the deduction of the reserve requirement (actual existing depreciation and depletion) rather than the excessive reserve should be made so as to lay "a sound basis for future regulation and control of rates." *Id.,* p. 18. As we have pointed out, it determined accrued depletion and depreciation to be $22,328,016; and it allowed approximately $1,460,000 as the annual operating expense for depletion and depreciation.[6]

Hope's estimate of original cost was about $69,735,- 000—approximately $17,000,000 more than the amount found by the Commission. The item of $17,000,000 was made up largely of expenditures which prior to December 31, 1938, were charged to operating expenses. Chief among those expenditures was some $12,600,000 expended

---

[6] The Commission noted that the case was "free from the usual complexities involved in the estimate of gas reserves because the geologists for the company and the Commission presented estimates of the remaining recoverable gas reserves which were about one per cent apart." 44 P. U. R. (N. S.), pp. 19–20.

The Commission utilized the "straight-line-basis" for determining the depreciation and depletion reserve requirements. It used estimates of the average service lives of the property by classes based in part on an inspection of the physical condition of the property. And studies were made of Hope's retirement experience and maintenance policies over the years. The average service lives of the various classes of property were converted into depreciation rates and then applied to the cost of the property to ascertain the portion of the cost which had expired in rendering the service.

The record in the present case shows that Hope is on the lookout for new sources of supply of natural gas and is contemplating an extension of its pipe line into Louisiana for that purpose. The Commission recognized in fixing the rates of depreciation that much material may be used again when various present sources of gas supply are exhausted, thus giving that property more than scrap value at the end of its present use.

in well-drilling prior to 1923. Most of that sum was expended by Hope for labor, use of drilling-rigs, hauling, and similar costs of well-drilling. Prior to 1923 Hope followed the general practice of the natural gas industry and charged the cost of drilling wells to operating expenses. Hope continued that practice until the Public Service Commission of West Virginia in 1923 required it to capitalize such expenditures, as does the Commission under its present Uniform System of Accounts.[7] The Commission refused to add such items to the rate base stating that "No greater injustice to consumers could be done than to allow items as operating expenses and at a later date include them in the rate base, thereby placing multiple charges upon the consumers." *Id.*, p. 12. For the same reason the Commission excluded from the rate base about $1,600,000 of expenditures on properties which Hope acquired from other utilities, the latter having charged those payments to operating expenses. The Commission disallowed certain other overhead items amounting to over $3,000,000 which also had been previously charged to operating expenses. And it refused to add some $632,000 as interest during construction since no interest was in fact paid.

Hope contended that it should be allowed a return of not less than 8%. The Commission found that an 8% return would be unreasonable but that 6½% was a fair rate of return. That rate of return, applied to the rate base of $33,712,526, would produce $2,191,314 annually, as compared with the present income of not less than $5,801,171.

The Circuit Court of Appeals set aside the order of the Commission for the following reasons. (1) It held that the rate base should reflect the "present fair value" of the

[7] See Uniform System of Accounts prescribed for Natural Gas Companies effective January 1, 1940, Account No. 332.1.

property, that the Commission in determining the "value" should have considered reproduction cost and trended original cost, and that "actual legitimate cost" (prudent investment) was not the proper measure of "fair value" where price levels had changed since the investment. (2) It concluded that the well-drilling costs and overhead items in the amount of some $17,000,000 should have been included in the rate base. (3) It held that accrued depletion and depreciation and the annual allowance for that expense should be computed on the basis of "present fair value" of the property, not on the basis of "actual legitimate cost."

The Circuit Court of Appeals also held that the Commission had no power to make findings as to past rates in aid of state regulation. But it concluded that those findings were proper as a step in the process of fixing future rates. Viewed in that light, however, the findings were deemed to be invalidated by the same errors which vitiated the findings on which the rate order was based.

*Order Reducing Rates.* Congress has provided in § 4 (a) of the Natural Gas Act that all natural gas rates subject to the jurisdiction of the Commission "shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful." Sec. 5 (a) gives the Commission the power, after hearing, to determine the "just and reasonable rate" to be thereafter observed and to fix the rate by order. Sec. 5 (a) also empowers the Commission to order a "decrease where existing rates are unjust, . . . unlawful, or are not the lowest reasonable rates." And Congress has provided in § 19 (b) that on review of these rate orders the "finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." Congress, however, has provided no formula by which the "just and reasonable" rate is to be determined. It has not filled in the

details of the general prescription [8] of § 4 (a) and § 5 (a). It has not expressed in a specific rule the fixed principle of "just and reasonable."

When we sustained the constitutionality of the Natural Gas Act in the *Natural Gas Pipeline Co.* case, we stated that the "authority of Congress to regulate the prices of commodities in interstate commerce is at least as great under the Fifth Amendment as is that of the States under the Fourteenth to regulate the prices of commodities in intrastate commerce." 315 U. S. p. 582. Rate-making is indeed but one species of price-fixing. *Munn* v. *Illinois*, 94 U. S. 113, 134. The fixing of prices, like other applications of the police power, may reduce the value of the property which is being regulated. But the fact that the value is reduced does not mean that the regulation is invalid. *Block* v. *Hirsh,* 256 U. S. 135, 155–157; *Nebbia* v. *New York,* 291 U. S. 502, 523–539 and cases cited. It does, however, indicate that "fair value" is the end product of the process of rate-making not the starting point as the Circuit Court of Appeals held. The heart of the matter is that rates cannot be made to depend upon "fair value" when the value of the going enterprise depends on earnings under whatever rates may be anticipated.[9]

---

[8] Sec. 6 of the Act comes the closest to supplying any definite criteria for rate making. It provides in subsection (a) that, "The Commission may investigate and ascertain the actual legitimate cost of the property of every natural-gas company, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation and the fair value of such property." Subsection (b) provides that every natural-gas company on request shall file with the Commission a statement of the "original cost" of its property and shall keep the Commission informed regarding the "cost" of all additions, etc.

[9] We recently stated that the meaning of the word "value" is to be gathered "from the purpose for which a valuation is being made. Thus the question in a valuation for rate making is how much a utility

We held in *Federal Power Commission* v. *Natural Gas Pipeline Co., supra,* that the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, moreover, involves the making of "pragmatic adjustments." *Id.,* p. 586. And when the Commission's order is challenged in the courts, the question is whether that order "viewed in its entirety" meets the requirements of the Act. *Id.,* p. 586. Under the statutory standard of "just and reasonable" it is the result reached not the method employed which is controlling. Cf. *Los Angeles Gas & Electric Corp.* v. *Railroad Commission,* 289 U. S. 287, 304–305, 314; *West Ohio Gas Co.* v. *Public Utilities Commission* (No. 1), 294 U. S. 63, 70; *West* v. *Chesapeake & Potomac Tel. Co.,* 295 U. S. 662, 692–693 (dissenting opinion). It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences. Cf. *Railroad Commission* v. *Cumberland Tel. & T. Co.,* 212 U. S. 414; *Lindheimer* v. *Illinois Bell Tel. Co., supra,* pp. 164, 169; *Railroad Commission* v. *Pacific Gas & Electric Co.,* 302 U. S. 388, 401.

---

will be allowed to earn. The basic question in a valuation for reorganization purposes is how much the enterprise in all probability can earn." *Institutional Investors* v. *Chicago, M., St. P. & P. R. Co.,* 318 U. S. 523, 540.

The rate-making process under the Act, i. e., the fixing of "just and reasonable" rates, involves a balancing of the investor and the consumer interests. Thus we stated in the *Natural Gas Pipeline Co.* case that "regulation does not insure that the business shall produce net revenues." 315 U. S. p. 590. But such considerations aside, the investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated. From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. Cf. *Chicago & Grand Trunk Ry. Co.* v. *Wellman,* 143 U. S. 339, 345–346. By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. See *Missouri ex rel. Southwestern Bell Tel. Co.* v. *Public Service Commission,* 262 U. S. 276, 291 (Mr. Justice Brandeis concurring). The conditions under which more or less might be allowed are not important here. Nor is it important to this case to determine the various permissible ways in which any rate base on which the return is computed might be arrived at. For we are of the view that the end result in this case cannot be condemned under the Act as unjust and unreasonable from the investor or company viewpoint.

We have already noted that Hope is a wholly owned subsidiary of the Standard Oil Co. (N. J.). It has no securities outstanding except stock. All of that stock has been owned by Standard since 1908. The par amount presently outstanding is approximately $28,000,000 as compared with the rate base of $33,712,526 established by

the Commission.  Of the total outstanding stock $11,000,-000 was issued in stock dividends.  The balance, or about $17,000,000, was issued for cash or other assets.  During the four decades of its operations Hope has paid over $97,000,000 in cash dividends.  It had, moreover, accumulated by 1940 an earned surplus of about $8,000,000.  It had thus earned the total investment in the company nearly seven times.  Down to 1940 it earned over 20% per year on the average annual amount of its capital stock issued for cash or other assets.  On an average invested capital of some $23,000,000 Hope's average earnings have been about 12% a year.  And during this period it had accumulated in addition reserves for depletion and depreciation of about $46,000,000.  Furthermore, during 1939, 1940 and 1941, Hope paid dividends of 10% on its stock.  And in the year 1942, during about half of which the lower rates were in effect, it paid dividends of 7½%.  From 1939–1942 its earned surplus increased from $5,250,000 to about $13,700,000, i. e., to almost half the par value of its outstanding stock.

As we have noted, the Commission fixed a rate of return which permits Hope to earn $2,191,314 annually.  In determining that amount it stressed the importance of maintaining the financial integrity of the company.  It considered the financial history of Hope and a vast array of data bearing on the natural gas industry, related businesses, and general economic conditions.  It noted that the yields on better issues of bonds of natural gas companies sold in the last few years were "close to 3 per cent," 44 P. U. R. (N. S.), p. 33.  It stated that the company was a "seasoned enterprise whose risks have been minimized" by adequate provisions for depletion and depreciation (past and present) with "concurrent high profits," by "protected established markets, through affiliated distribution companies, in populous and industrialized areas," and by a supply of gas locally to meet all require-

ments, "except on certain peak days in the winter, which it is feasible to supplement in the future with gas from other sources." *Id.*, p. 33. The Commission concluded, "The company's efficient management, established markets, financial record, affiliations, and its prospective business place it in a strong position to attract capital upon favorable terms when it is required." *Id.*, p. 33.

In view of these various considerations we cannot say that an annual return of $2,191,314 is not "just and reasonable" within the meaning of the Act. Rates which enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed certainly cannot be condemned as invalid, even though they might produce only a meager return on the so-called "fair value" rate base. In that connection it will be recalled that Hope contended for a rate base of $66,000,000 computed on reproduction cost new. The Commission points out that if that rate base were accepted, Hope's average rate of return for the four-year period from 1937–1940 would amount to 3.27%. During that period Hope earned an annual average return of about 9% on the average investment. It asked for no rate increases. Its properties were well maintained and operated. As the Commission says, such a modest rate of 3.27% suggests an "inflation of the base on which the rate has been computed." *Dayton Power & Light Co.* v. *Public Utilities Commission*, 292 U. S. 290, 312. Cf. *Lindheimer* v. *Illinois Bell Tel. Co.*, *supra*, p. 164. The incongruity between the actual operations and the return computed on the basis of reproduction cost suggests that the Commission was wholly justified in rejecting the latter as the measure of the rate base.

In view of this disposition of the controversy we need not stop to inquire whether the failure of the Commission to add the $17,000,000 of well-drilling and other costs to

the rate base was consistent with the prudent investment theory as developed and applied in particular cases.

Only a word need be added respecting depletion and depreciation. We held in the *Natural Gas Pipeline Co.* case that there was no constitutional requirement "that the owner who embarks in a wasting-asset business of limited life shall receive at the end more than he has put into it." 315 U. S. p. 593. The Circuit Court of Appeals did not think that that rule was applicable here because Hope was a utility required to continue its service to the public and not scheduled to end its business on a day certain as was stipulated to be true of the Natural Gas Pipeline Co. But that distinction is quite immaterial. The ultimate exhaustion of the supply is inevitable in the case of all natural gas companies. Moreover, this Court recognized in *Lindheimer* v. *Illinois Bell Tel. Co., supra,* the propriety of basing annual depreciation on cost.[10] By such a procedure the utility is made whole and the integrity of its investment maintained.[11] No more is required.[12] We cannot approve the contrary holding

[10] Chief Justice Hughes said in that case (292 U. S. pp. 168–169): "If the predictions of service life were entirely accurate and retirements were made when and as these predictions were precisely fulfilled, the depreciation reserve would represent the consumption of capital, on a cost basis, according to the method which spreads that loss over the respective service periods. But if the amounts charged to operating expenses and credited to the account for depreciation reserve are excessive, to that extent subscribers for the telephone service are required to provide, in effect, capital contributions, not to make good losses incurred by the utility in the service rendered and thus to keep its investment unimpaired, but to secure additional plant and equipment upon which the utility expects a return."

[11] See Mr. Justice Brandeis (dissenting) in *United Railways Co.* v. *West,* 280 U. S. 234, 259–288, for an extended analysis of the problem.

[12] It should be noted that the Act provides no specific rule governing depletion and depreciation. Sec. 9 (a) merely states that the Commission "may from time to time ascertain and determine, and by order fix, the proper and adequate rates of depreciation and

of *United Railways Co.* v. *West,* 280 U. S. 234, 253–254. Since there are no constitutional requirements more exacting than the standards of the Act, a rate order which conforms to the latter does not run afoul of the former.

*The Position of West Virginia.* The State of West Virginia, as well as its Public Service Commission, intervened in the proceedings before the Commission and participated in the hearings before it. They have also filed a brief *amicus curiae* here and have participated in the argument at the bar. Their contention is that the result achieved by the rate order "brings consequences which are unjust to West Virginia and its citizens" and which "unfairly depress the value of gas, gas lands and gas leaseholds, unduly restrict development of their natural resources, and arbitrarily transfer their properties to the residents of other states without just compensation therefor."

West Virginia points out that the Hope Natural Gas Co. holds a large number of leases on both producing and unoperated properties. The owner or grantor receives from the operator or grantee delay rentals as compensation for postponed drilling. When a producing well is successfully brought in, the gas lease customarily continues indefinitely for the life of the field. In that case the operator pays a stipulated gas-well rental or in some cases a gas royalty equivalent to one-eighth of the gas marketed.[13] Both the owner and operator have valuable property interests in the gas which are separately taxable under West Virginia law. The contention is that the reversionary interests in the leaseholds should be represented in the rate proceedings since it is their gas which is being sold in interstate

amortization of the several classes of property of each natural-gas company used or useful in the production, transportation, or sale of natural gas."

[13] See Simonton, The Nature of the Interest of the Grantee Under an Oil and Gas Lease (1918), 25 W. Va. L. Quar. 295.

commerce. It is argued, moreover, that the owners of the reversionary interests should have the benefit of the "discovery value" of the gas leaseholds, not the interstate consumers. Furthermore, West Virginia contends that the Commission in fixing a rate for natural gas produced in that State should consider the effect of the rate order on the economy of West Virginia. It is pointed out that gas is a wasting asset with a rapidly diminishing supply. As a result West Virginia's gas deposits are becoming increasingly valuable. Nevertheless the rate fixed by the Commission reduces that value. And that reduction, it is said, has severe repercussions on the economy of the State. It is argued in the first place that as a result of this rate reduction Hope's West Virginia property taxes may be decreased in view of the relevance which earnings have under West Virginia law in the assessment of property for tax purposes.[14] Secondly, it is pointed out that West Virginia has a production tax [15] on the "value" of the gas exported from the State. And we are told that for purposes of that tax "value" becomes under West Virginia law "practically the substantial equivalent of market value." Thus West Virginia argues that undervaluation of Hope's gas leaseholds will cost the State many thousands of dollars in taxes. The effect, it is urged, is to impair West Virginia's tax structure for the benefit of Ohio and Pennsylvania consumers. West Virginia emphasizes, moreover, its deep interest in the conservation of its natural resources including its natural gas. It says that a reduction of the value of these leasehold values will jeopardize these conservation policies in three respects: (1) exploratory development of new fields will be discouraged; (2) abandonment of low-yield high-cost marginal wells will be hastened; and (3) secondary recovery of oil will be hampered.

[14] *West Penn Power Co.* v. *Board of Review*, 112 W. Va. 442, 164 S. E. 862.

[15] W. Va. Rev. Code of 1943, ch. 11, Art. 13, §§ 2a, 3a.

Furthermore, West Virginia contends that the reduced valuation will harm one of the great industries of the State and that harm to that industry must inevitably affect the welfare of the citizens of the State. It is also pointed out that West Virginia has a large interest in coal and oil as well as in gas and that these forms of fuel are competitive. When the price of gas is materially cheapened, consumers turn to that fuel in preference to the others. As a result this lowering of the price of natural gas will have the effect of depreciating the price of West Virginia coal and oil.

West Virginia insists that in neglecting this aspect of the problem the Commission failed to perform the function which Congress entrusted to it and that the case should be remanded to the Commission for a modification of its order.[16]

We have considered these contentions at length in view of the earnestness with which they have been urged upon us. We have searched the legislative history of the Natural Gas Act for any indication that Congress entrusted to the Commission the various considerations which West Virginia has advanced here. And our conclusion is that Congress did not.

We pointed out in *Illinois Natural Gas Co.* v. *Public Service Co.*, 314 U. S. 498, 506, that the purpose of the Natural Gas Act was to provide, "through the exercise of the national power over interstate commerce, an agency for regulating the wholesale distribution to public service companies of natural gas moving interstate, which this Court had declared to be interstate commerce not subject to certain types of state regulation." As stated in the House Report the "basic purpose" of this legislation was "to occupy" the field in which such cases as *Missouri* v.

---

[16] West Virginia suggests as a possible solution (1) that a "going concern value" of the company's tangible assets be included in the rate base and (2) that the fair market value of gas delivered to customers be added to the outlay for operating expenses and taxes.

*Kansas Gas Co.,* 265 U. S. 298, and *Public Utilities Commission* v. *Attleboro Steam & Electric Co.,* 273 U. S. 83, had held the States might not act.  H. Rep. No. 709, 75th Cong., 1st Sess., p. 2.  In accomplishing that purpose the bill was designed to take "no authority from State commissions" and was "so drawn as to complement and in no manner usurp State regulatory authority." *Id.,* p. 2.  And the Federal Power Commission was given no authority over the "production or gathering of natural gas." § 1 (b).

The primary aim of this legislation was to protect consumers against exploitation at the hands of natural gas companies.  Due to the hiatus in regulation which resulted from the *Kansas Gas Co.* case and related decisions state commissions found it difficult or impossible to discover what it cost interstate pipe-line companies to deliver gas within the consuming states; and thus they were thwarted in local regulation.  H. Rep. No. 709, *supra,* p. 3.  Moreover, the investigations of the Federal Trade Commission had disclosed that the majority of the pipe-line mileage in the country used to transport natural gas, together with an increasing percentage of the natural gas supply for pipe-line transportation, had been acquired by a handful of holding companies.[17]  State commissions, independent producers, and communities having or seeking the service were growing quite helpless against these combinations.[18]  These were the types of problems with which those participating in the hearings were preoccupied.[19]  Congress addressed itself to those specific evils.

---

[17] S. Doc. 92, Pt. 84–A, ch. XII, Final Report, Federal Trade Commission to the Senate pursuant to S. Res. No. 83, 70th Cong., 1st Sess.

[18] S. Doc. 92, Pt. 84–A, chs. XII, XIII, *op. cit., supra,* note 17.

[19] See Hearings on H. R. 11662, Subcommittee of House Committee on Interstate & Foreign Commerce, 74th Cong., 2d Sess.; Hearings on H. R. 4008, House Committee on Interstate & Foreign Commerce, 75th Cong., 1st Sess.

The Federal Power Commission was given broad powers of regulation. The fixing of "just and reasonable" rates (§ 4) with the powers attendant thereto [20] was the heart of the new regulatory system. Moreover, the Commission was given certain authority by § 7 (a), on a finding that the action was necessary or desirable "in the public interest," to require natural gas companies to extend or improve their transportation facilities and to sell gas to any authorized local distributor. By § 7 (b) it was given control over the abandonment of facilities or of service. And by § 7 (c), as originally enacted, no natural gas company could undertake the construction or extension of any facilities for the transportation of natural gas to a market in which natural gas was already being served by another company, or sell any natural gas in such a market, without obtaining a certificate of public convenience and necessity from the Commission. In passing on such applications for certificates of convenience and necessity the Commission was told by § 7 (c), as originally enacted, that it was "the intention of Congress that natural gas shall be sold in interstate commerce for resale for ultimate public consumption for domestic, commercial, industrial, or any other use at the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest." The latter provision was deleted from § 7 (c) when that subsection was amended by the Act of February 7, 1942, 56 Stat. 83. By that amendment limited grandfather rights were granted companies desiring to extend their facilities and services over the routes or within the area which they were already serving. Moreover, § 7 (c) was broadened so as to require certifi-

---

[20] The power to investigate and ascertain the "actual legitimate cost" of property (§ 6), the requirement as to books and records (§ 8), control over rates of depreciation (§ 9), the requirements for periodic and special reports (§ 10), the broad powers of investigation (§ 14) are among the chief powers supporting the rate-making function.

cates of public convenience and necessity not only where the extensions were being made to markets in which natural gas was already being sold by another company but in other situations as well.

These provisions were plainly designed to protect the consumer interests against exploitation at the hands of private natural gas companies. When it comes to cases of abandonment or of extensions of facilities or service, we may assume that, apart from the express exemptions [21] contained in § 7, considerations of conservation are material to the issuance of certificates of public convenience and necessity. But the Commission was not asked here for a certificate of public convenience and necessity under § 7 for any proposed construction or extension. It was faced with a determination of the amount which a private operator should be allowed to earn from the sale of natural gas across state lines through an established distribution system. Secs. 4 and 5, not § 7, provide the standards for that determination. We cannot find in the words of the Act or in its history the slightest intimation or suggestion that the exploitation of consumers by private operators through the maintenance of high rates should be allowed to continue provided the producing states obtain indirect benefits from it. That apparently was the Commission's view of the matter, for the same arguments advanced here were presented to the Commission and not adopted by it.

We do not mean to suggest that Congress was unmindful of the interests of the producing states in their natural gas supplies when it drafted the Natural Gas Act. As we have said, the Act does not intrude on the domain traditionally reserved for control by state commissions; and the Federal Power Commission was given no authority over

---

[21] Apart from the grandfather clause contained in § 7 (c), there is the provision of § 7 (f) that a natural gas company may enlarge or extend its facilities within the "service area" determined by the Commission without any further authorization.

"the production or gathering of natural gas." § 1 (b). In addition, Congress recognized the legitimate interests of the States in the conservation of natural gas. By § 11 Congress instructed the Commission to make reports on compacts between two or more States dealing with the conservation, production and transportation of natural gas.[22] The Commission was also directed to recommend further legislation appropriate or necessary to carry out any proposed compact and "to aid in the conservation of natural-gas resources within the United States and in the orderly, equitable, and economic production, transportation, and distribution of natural gas." § 11 (a). Thus Congress was quite aware of the interests of the producing states in their natural gas supplies.[23] But it left the protection of

[22] See Act of July 7, 1943, c. 194, 57 Stat. 383, containing an "Interstate Compact to Conserve Oil and Gas" between Oklahoma, Texas, New Mexico, Illinois, Colorado, and Kansas.

[23] As we have pointed out, § 7 (c) was amended by the Act of February 7, 1942 (56 Stat. 83) so as to require certificates of public convenience and necessity not only where the extensions were being made to markets in which natural gas was already being sold by another company but to other situations as well. Considerations of conservation entered into the proposal to give the Act that broader scope. H. Rep. No. 1290, 77th Cong., 1st Sess., pp. 2–3. And see Annual Report, Federal Power Commission (1940) pp. 79, 80; Baum, The Federal Power Commission and State Utility Regulation (1942), p. 261.

The bill amending § 7 (c) originally contained a subsection (h) reading as follows: "Nothing contained in this section shall be construed to affect the authority of a State within which natural gas is produced to authorize or require the construction or extension of facilities for the transportation and sale of such gas within such State: Provided, however, That the Commission, after a hearing upon complaint or upon its own motion, may by order forbid any intrastate construction or extension by any natural-gas company which it shall find will prevent such company from rendering adequate service to its customers in interstate or foreign commerce in territory already being served." See Hearings on H. R. 5249, House Committee on Interstate & Foreign Commerce, 77th Cong., 1st Sess., pp. 7, 11, 21, 29,

those interests to measures other than the maintenance of high rates to private companies. If the Commission is to be compelled to let the stockholders of natural gas companies have a feast so that the producing states may receive crumbs from that table, the present Act must be redesigned. Such a project raises questions of policy which go beyond our province.

It is hardly necessary to add that a limitation on the net earnings of a natural gas company from its interstate business is not a limitation on the power of the producing state either to safeguard its tax revenues from that industry [24] or to protect the interests of those who sell their gas to the interstate operator.[25] The return which the Com-

---

32–33. In explanation of its deletion the House Committee Report stated, pp. 4–5: "The increasingly important problems raised by the desire of several States to regulate the use of the natural gas produced therein in the interest of consumers within such States, as against the Federal power to regulate interstate commerce in the interest of both interstate and intrastate consumers, are deemed by the committee to warrant further intensive study and probably a more detailed and comprehensive plan for the handling thereof than that which would have been provided by the stricken subsection."

[24] We have noted that in the annual operating expenses of some $16,000,000 the Commission included West Virginia and federal taxes. And in the net increase of $421,160 over 1940 operating expenses allowed by the Commission was some $80,000 for increased West Virginia property taxes. The adequacy of these amounts has not been challenged here.

[25] The Commission included in the aggregate annual operating expenses which it allowed some $8,500,000 for gas purchased. It also allowed about $1,400,000 for natural gas production and about $600,000 for exploration and development.

It is suggested, however, that the Commission in ascertaining the cost of Hope's natural gas production plant ·proceeded contrary to § 1 (b) which provides that the Act shall not apply to "the production or gathering of natural gas." But such valuation, like the provisions for operating expenses, is essential to the rate-making function as customarily performed in this country. Cf. Smith, The Control of Power Rates in the United States and England (1932), 159 The

mission allowed was the net return after all such charges.

It is suggested that the Commission has failed to perform its duty under the Act in that it has not allowed a return for gas production that will be enough to induce private enterprise to perform completely and efficiently its functions for the public. The Commission, however, was not oblivious of those matters. It considered them. It allowed, for example, delay rentals and exploration and development costs in operating expenses.[26] No serious attempt has been made here to show that they are inadequate. We certainly cannot say that they are, unless we are to substitute our opinions for the expert judgment of the administrators to whom Congress entrusted the decision. Moreover, if in light of experience they turn out to be inadequate for development of new sources of supply, the doors of the Commission are open for increased allowances. This is not an order for all time. The Act contains machinery for obtaining rate adjustments. § 4.

But it is said that the Commission placed too low a rate on gas for industrial purposes as compared with gas for domestic purposes and that industrial uses should be discouraged. It should be noted in the first place that the rates which the Commission has fixed are Hope's interstate wholesale rates to distributors, not interstate rates to industrial users [27] and domestic consumers. We hardly

---

Annals 101. Indeed § 14 (b) of the Act gives the Commission the power to "determine the propriety and reasonableness of the inclusion in operating expenses, capital, or surplus of all delay rentals or other forms of rental or compensation for unoperated lands and leases."

[26] See note 25, *supra*.

[27] The Commission has expressed doubts over its power to fix rates on "direct sales to industries" from interstate pipelines as distinguished from "sales for resale to the industrial customers of distributing companies." Annual Report, Federal Power Commission (1940), p. 11.

can assume, in view of the history of the Act and its provisions, that the resales intrastate by the customer companies which distribute the gas to ultimate consumers in Ohio and Pennsylvania are subject to the rate-making powers of the Commission.[28]   But in any event those rates are not in issue here.   Moreover, we fail to find in the power to fix "just and reasonable" rates the power to fix rates which will disallow or discourage resales for industrial use.   The Committee Report stated that the Act provided "for regulation along recognized and more or less standardized lines" and that there was "nothing novel in its provisions."   H. Rep. No. 709, *supra,* p. 3.   Yet if we are now to tell the Commission to fix the rates so as to discourage particular uses, we would indeed be injecting into a rate case a "novel" doctrine which has no express statutory sanction.   The same would be true if we were to hold that the wasting-asset nature of the industry required the maintenance of the level of rates so that natural gas companies could make a greater profit on each unit of gas sold.   Such theories of rate-making for this industry may or may not be desirable.   The difficulty is that § 4 (a) and § 5 (a) contain only the conventional standards of rate-making for natural gas companies.[29]   The

---

[28] Sec. 1 (b) of the Act provides: "The provisions of this Act shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."   And see § 2 (6), defining a "natural-gas company," and H. Rep. No. 709, *supra,* pp. 2, 3.

[29] The wasting-asset characteristic of the industry was recognized prior to the Act as requiring the inclusion of a depletion allowance among operating expenses.   See *Columbus Gas & Fuel Co.* v. *Public Utilities Commission,* 292 U. S. 398, 404–405.   But no such theory

Act of February 7, 1942, by broadening § 7 gave the Commission some additional authority to deal with the conservation aspects of the problem.[30] But § 4 (a) and § 5 (a) were not changed. If the standard of "just and reasonable" is to sanction the maintenance of high rates by a natural gas company because they restrict the use of natural gas for certain purposes, the Act must be further amended.

It is finally suggested that the rates charged by Hope are discriminatory as against domestic users and in favor of industrial users. That charge is apparently based on § 4 (b) of the Act which forbids natural gas companies from maintaining "any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service." The power of the Commission to eliminate any such unreasonable differences or discriminations is plain. § 5 (a). The Commission, however, made no findings under § 4 (b). Its failure in that regard was not challenged in the petition to review. And it has not been raised or argued here by any party. Hence the problem of discrimination has no proper place in the present decision. It will be time enough to pass on that issue when it is presented to us. Congress has entrusted the administration of the Act to the Commission, not to the courts. Apart from the requirements of judicial review it is not

---

of rate-making for natural gas companies as is now suggested emerged from the cases arising during the earlier period of regulation.

[30] The Commission has been alert to the problems of conservation in its administration of the Act. It has indeed suggested that it might be wise to restrict the use of natural gas "by functions rather than by areas." Annual Report (1940) p. 79.

The Commission stated in that connection that natural gas was particularly adapted to certain industrial uses. But it added that the general use of such gas "under boilers for the production of steam" is "under most circumstances of very questionable social economy." *Ibid.*

for us to advise the Commission how to discharge its functions.

*Findings as to the Lawfulness of Past Rates.* As we have noted, the Commission made certain findings as to the lawfulness of past rates which Hope had charged its interstate customers. Those findings were made on the complaint of the City of Cleveland and in aid of state regulation. It is conceded that under the Act the Commission has no power to make reparation orders. And its power to fix rates admittedly is limited to those "to be thereafter observed and in force." § 5 (a). But the Commission maintains that it has the power to make findings as to the lawfulness of past rates even though it has no power to fix those rates.[31] However that may be, we do not think that these findings were reviewable under § 19 (b) of the Act. That section gives any party "aggrieved by an order" of the Commission a review "of such order" in the circuit court of appeals for the circuit where the natural gas company is located or has its principal place of business or in the United States Court of Appeals for the District of Columbia. We do not think that the findings in question fall within that category.

The Court recently summarized the various types of administrative action or determination reviewable as orders under the Urgent Deficiencies Act of October 22,

---

[31] The argument is that § 4 (a) makes "unlawful" the charging of any rate that is not just and reasonable. And § 14 (a) gives the Commission power to investigate any matter "which it may find necessary or proper in order to determine whether any person has violated" any provision of the Act. Moreover, § 5 (b) gives the Commission power to investigate and determine the cost of production or transportation of natural gas in cases where it has "no authority to establish a rate governing the transportation or sale of such natural gas." And § 17 (c) directs the Commission to "make available to the several State commissions such information and reports as may be of assistance in State regulation of natural-gas companies." For a discussion of these points by the Commission see 44 P. U. R. (N. S.) pp. 34–35.

1913, 28 U. S. C. §§ 45, 47a, and kindred statutory provisions. *Rochester Telephone Corp.* v. *United States,* 307 U. S. 125. It was there pointed out that where "the order sought to be reviewed does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action," it is not reviewable. *Id.,* p. 130. The Court said, "In view of traditional conceptions of federal judicial power, resort to the courts in these situations is either premature or wholly beyond their province." *Id.,* p. 130. And see *United States* v. *Los Angeles & Salt Lake R. Co.,* 273 U. S. 299, 309, 310; *Shannahan* v. *United States,* 303 U. S. 596. These considerations are apposite here. The Commission has no authority to enforce these findings. They are "the exercise solely of the function of investigation." *United States* v. *Los Angeles & Salt Lake R. Co., supra,* p. 310. They are only a preliminary, interim step towards possible future action—action not by the Commission but by wholly independent agencies. The outcome of those proceedings may turn on factors other than these findings. These findings may never result in the respondent feeling the pinch of administrative action.

*Reversed.*

MR. JUSTICE ROBERTS took no part in the consideration or decision of this case.

Opinion of MR. JUSTICE BLACK and MR. JUSTICE MURPHY:

We agree with the Court's opinion and would add nothing to what has been said but for what is patently a wholly gratuitous assertion as to Constitutional law in the dissent of MR. JUSTICE FRANKFURTER. We refer to the statement that "Congressional acquiescence to date in the doctrine of *Chicago, M. & St. P. Ry. Co.* v. *Minnesota, supra,* may fairly be claimed." That was the case in which a majority of this Court was finally induced to expand the meaning

of "due process" so as to give courts power to block efforts of the state and national governments to regulate economic affairs. The present case does not afford a proper occasion to discuss the soundness of that doctrine because, as stated in Mr. Justice Frankfurter's dissent, "that issue is not here in controversy." The salutary practice whereby courts do not discuss issues in the abstract applies with peculiar force to Constitutional questions. Since, however, the dissent adverts to a highly controversial due process doctrine and implies its acceptance by Congress, we feel compelled to say that we do not understand that Congress voluntarily has acquiesced in a Constitutional principle of government that courts, rather than legislative bodies, possess final authority over regulation of economic affairs. Even this Court has not always fully embraced that principle, and we wish to repeat that we have never acquiesced in it, and do not now. See *Federal Power Commission* v. *Natural Gas Pipeline Co.*, 315 U. S. 575, 599–601.

Mr. Justice Reed, dissenting:

This case involves the problem of rate making under the Natural Gas Act. Added importance arises from the obvious fact that the principles stated are generally applicable to all federal agencies which are entrusted with the determination of rates for utilities. Because my views differ somewhat from those of my brethren, it may be of some value to set them out in a summary form.

The Congress may fix utility rates in situations subject to federal control without regard to any standard except the constitutional standards of due process and for taking private property for public use without just compensation. *Wilson* v. *New,* 243 U. S. 332, 350. A Commission, however, does not have this freedom of action. Its powers are limited not only by the constitutional standards but also by the standards of the delegation. Here the standard added by the Natural Gas Act is that the rate be "just

and reasonable." [1]   Section 6 [2] throws additional light on the meaning of these words.

When the phrase was used by Congress to describe allowable rates, it had relation to something ascertainable. The rates were not left to the whim of the Commission. The rates fixed would produce an annual return and that annual return was to be compared with a theoretical just and reasonable return, all risks considered, on the fair value of the property used and useful in the public service at the time of the determination.

Such an abstract test is not precise.  The agency charged with its determination has a wide range before it could properly be said by a court that the agency had disregarded statutory standards or had confiscated the property of the utility for public use.  Cf. *Chicago, M. & St. P. Ry. Co.* v. *Minnesota*, 134 U. S. 418, 461–66, dissent. This is as Congress intends.  Rates are left to an experienced agency particularly competent by training to appraise the amount required.

The decision as to a reasonable return had not been a source of great difficulty, for borrowers and lenders reached such agreements daily in a multitude of situations; and although the determination of fair value had been troublesome, its essentials had been worked out in fairness to investor and consumer by the time of the en-

---

[1] Natural Gas Act, § 4 (a), 52 Stat. 821, 822, 15 U. S. C. § 717 (a).

[2] 52 Stat. 821, 824, 15 U. S. C. § 717e:

"(a) The Commission may investigate and ascertain the actual legitimate cost of the property of every natural-gas company, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation and the fair value of such property.

"(b) Every natural-gas company upon request shall file with the Commission an inventory of all or any part of its property and a statement of the original cost thereof, and shall keep the Commission informed regarding the cost of all additions, betterments, extensions, and new construction."

actment of this Act.  Cf. *Los Angeles Gas & Electric Corp.* v. *Railroad Commission*, 289 U. S. 287, 304 *et seq.* The results were well known to Congress and had that body desired to depart from the traditional concepts of fair value and earnings, it would have stated its intention plainly.  *Helvering* v. *Griffiths*, 318 U. S. 371.

It was already clear that when rates are in dispute, "earnings produced by rates do not afford a standard for decision."  289 U. S. at 305.  Historical cost, prudent investment and reproduction cost [3] were all relevant factors in determining fair value.  Indeed, disregarding the pioneer investor's risk, if prudent investment and reproduction cost were not distorted by changes in price levels or technology, each of them would produce the same result.  The realization from the risk of an investment in a speculative field, such as natural gas utilities, should be reflected in the present fair value.[4]  The amount of evidence to be admitted on any point was of course in the agency's reasonable discretion, and it was free to give its own weight to these or other factors and to determine from all the evidence its own judgment as to the necessary rates.

[3] "Reproduction cost" has been variously defined, but for rate-making purposes the most useful sense seems to be, the minimum amount necessary to create at the time of the inquiry a modern plant capable of rendering equivalent service.  See I Bonbright, Valuation of Property (1937) 152.  Reproduction cost as the cost of building a replica of an obsolescent plant is not of real significance.

"Prudent investment" is not defined by the Court.  It may mean the sum originally put in the enterprise, either with or without additional amounts from excess earnings reinvested in the business.

[4] It is of no more than bookkeeping significance whether the Commission allows a rate of return commensurate with the risk of the original investment or the lower rate based on current risk and a capitalization reflecting the established earning power of a successful company and the probable cost of duplicating its services.  Cf. *A. T. & T. Co.* v. *United States*, 299 U. S. 232.  But the latter is the traditional method.

I agree with the Court in not imposing a rule of prudent investment alone in determining the rate base. This leaves the Commission free, as I understand it, to use any available evidence for its finding of fair value, including both prudent investment and the cost of installing at the present time an efficient system for furnishing the needed utility service.

My disagreement with the Court arises primarily from its view that it makes no difference how the Commission reached the rate fixed so long as the result is fair and reasonable. For me the statutory command to the Commission is more explicit. Entirely aside from the constitutional problem of whether the Congress could validly delegate its rate-making power to the Commission, *in toto* and without standards, it did legislate in the light of the relation of fair and reasonable to fair value and reasonable return. The Commission must therefore make its findings in observance of that relationship.

The Federal Power Commission did not, as I construe their action, disregard its statutory duty. They heard the evidence relating to historical and reproduction cost and to the reasonable rate of return, and they appraised its weight. The evidence of reproduction cost was rejected as unpersuasive, but from the other evidence they found a rate base, which is to me a determination of fair value. On that base the earnings allowed seem fair and reasonable. So far as the Commission went in appraising the property employed in the service, I find nothing in the result which indicates confiscation, unfairness or unreasonableness. Good administration of rate-making agencies under this method would avoid undue delay and render revaluations unnecessary except after violent fluctuations of price levels. Rate making under this method has been subjected to criticism. But until Congress changes the standards for the agencies, these rate-making bodies should continue the conventional theory of rate

making. It will probably be simpler to improve present methods than to devise new ones.

But a major error, I think, was committed in the disregard by the Commission of the investment in exploratory operations and other recognized capital costs. These were not considered by the Commission because they were charged to operating expenses by the company at a time when it was unregulated. Congress did not direct the Commission in rate making to deduct from the rate base capital investment which had been recovered during the unregulated period through excess earnings. In my view this part of the investment should no more have been disregarded in the rate base than any other capital investment which previously had been recovered and paid out in dividends or placed to surplus. Even if prudent investment throughout the life of the property is accepted as the formula for figuring the rate base, it seems to me illogical to throw out the admittedly prudent cost of part of the property because the earnings in the unregulated period had been sufficient to return the prudent cost to the investors over and above a reasonable return. What would the answer be under the theory of the Commission and the Court, if the only prudent investment in this utility had been the seventeen million capital charges which are now disallowed?

For the reasons heretofore stated, I should affirm the action of the Circuit Court of Appeals in returning the proceeding to the Commission for further consideration and should direct the Commission to accept the disallowed capital investment in determining the fair value for rate-making purposes.

MR. JUSTICE FRANKFURTER, dissenting:

My brother JACKSON has analyzed with particularity the economic and social aspects of natural gas as well as

the difficulties which led to the enactment of the Natural Gas Act, especially those arising out of the abortive attempts of States to regulate natural gas utilities. The Natural Gas Act of 1938 should receive application in the light of this analysis, and MR. JUSTICE JACKSON has, I believe, drawn relevant inferences regarding the duty of the Federal Power Commission in fixing natural gas rates. His exposition seems to me unanswered, and I shall say only a few words to emphasize my basic agreement with him.

For our society the needs that are met by public utilities are as truly public services as the traditional governmental functions of police and justice. They are not less so when these services are rendered by private enterprise under governmental regulation. Who ultimately determines the ways of regulation, is the decisive aspect in the public supervision of privately-owned utilities. Foreshadowed nearly sixty years ago, *Railroad Commission Cases,* 116 U. S. 307, 331, it was decided more than fifty years ago that the final say under the Constitution lies with the judiciary and not the legislature. *Chicago, M. & St. P. Ry. Co.* v. *Minnesota,* 134 U. S. 418.

While legal issues touching the proper distribution of governmental powers under the Constitution may always be raised, Congressional acquiescence to date in the doctrine of *Chicago, M. & St. P. Ry. Co.* v. *Minnesota, supra,* may fairly be claimed. But in any event that issue is not here in controversy. As pointed out in the opinions of my brethren, Congress has given only limited authority to the Federal Power Commission and made the exercise of that authority subject to judicial review. The Commission is authorized to fix rates chargeable for natural gas. But the rates that it can fix must be "just and reasonable." § 5 of the Natural Gas Act, 15 U. S. C. § 717 (d). Instead of making the Commission's rate determinations final, Con-

gress specifically provided for court review of such orders. To be sure, "the finding of the Commission as to the facts, if supported by substantial evidence" was made "conclusive," § 19 of the Act, 15 U. S. C. § 717r. But obedience of the requirement of Congress that rates be "just and reasonable" is not an issue of fact of which the Commission's own determination is conclusive. Otherwise, there would be nothing for a court to review except questions of compliance with the procedural provisions of the Natural Gas Act. Congress might have seen fit so to cast its legislation. But it has not done so. It has committed to the administration of the Federal Power Commission the duty of applying standards of fair dealing and of reasonableness relevant to the purposes expressed by the Natural Gas Act. The requirement that rates must be "just and reasonable" means just and reasonable in relation to appropriate standards. Otherwise Congress would have directed the Commission to fix such rates as in the judgment of the Commission are just and reasonable; it would not have also provided that such determinations by the Commission are subject to court review.

To what sources then are the Commission and the courts to go for ascertaining the standards relevant to the regulation of natural gas rates? It is at this point that MR. JUSTICE JACKSON's analysis seems to me pertinent. There appear to be two alternatives. Either the fixing of natural gas rates must be left to the unguided discretion of the Commission so long as the rates it fixes do not reveal a glaringly bad prophecy of the ability of a regulated utility to continue its service in the future. Or the Commission's rate orders must be founded on due consideration of all the elements of the public interest which the production and distribution of natural gas involve just because it is natural gas. These elements are reflected in the Natural Gas Act, if that Act be applied as an entirety. See, for

instance, §§ 4 (a) (b) (c) (d), 6, and 11, 15 U. S. C., §§ 717c (a) (b) (c) (d), 717c, and 717j. Of course the statute is not concerned with abstract theories of rate-making. But its very foundation is the "public interest," and the public interest is a texture of multiple strands. It includes more than contemporary investors and contemporary consumers. The needs to be served are not restricted to immediacy, and social as well as economic costs must be counted.

It will not do to say that it must all be left to the skill of experts. Expertise is a rational process and a rational process implies expressed reasons for judgment. It will little advance the public interest to substitute for the hodge-podge of the rule in *Smyth* v. *Ames,* 169 U. S. 466, an encouragement of conscious obscurity or confusion in reaching a result, on the assumption that so long as the result appears harmless its basis is irrelevant. That may be an appropriate attitude when state action is challenged as unconstitutional. Cf. *Driscoll* v. *Edison Co.,* 307 U. S. 104. But it is not to be assumed that it was the design of Congress to make the accommodation of the conflicting interests exposed in MR. JUSTICE JACKSON's opinion the occasion for a blind clash of forces or a partial assessment of relevant factors, either before the Commission or here.

The objection to the Commission's action is not that the rates it granted were too low but that the range of its vision was too narrow. And since the issues before the Commission involved no less than the total public interest, the proceedings before it should not be judged by narrow conceptions of common law pleading. And so I conclude that the case should be returned to the Commission. In order to enable this Court to discharge its duty of reviewing the Commission's order, the Commission should set forth with explicitness the criteria by which it is guided

in determining that rates are "just and reasonable," and it should determine the public interest that is in its keeping in the perspective of the considerations set forth by MR. JUSTICE JACKSON.

By MR. JUSTICE JACKSON:

Certainly the theory of the court below that ties rate-making to the fair-value-reproduction-cost formula should be overruled as in conflict with *Federal Power Commission* v. *Natural Gas Pipeline Co.*[1]   But the case should, I think, be the occasion for reconsideration of our rate-making doctrine as applied to natural gas and should be returned to the Commission, for further consideration in the light thereof.

The Commission appears to have understood the effect of the two opinions in the *Pipeline* case to be at least authority and perhaps direction to fix natural gas rates by exclusive application of the "prudent investment" rate base theory.  This has no warrant in the opinion of the Chief Justice for the Court, however, which released the Commission from subservience to "any single formula or combination of formulas" provided its order, "viewed in its entirety, produces no arbitrary result."  315 U. S. at 586.  The minority opinion I understood to advocate the "prudent investment" theory as a sufficient guide in a natural gas case.  The view was expressed in the court below that since this opinion was not expressly controverted it must have been approved.[2]  I disclaim this im-

---

[1] 315 U. S. 575.

[2] Judge Dobie, dissenting below, pointed out that the majority opinion in the *Pipeline* case "contains no express discussion of the Prudent Investment Theory" and that the concurring opinion contained a clear one, and said, "It is difficult for me to believe that the majority of the Supreme Court, believing otherwise, would leave such a statement unchallenged." The fact that two other Justices had as matter of record in our books long opposed the reproduction cost theory of rate bases and had commented favorably on the pru-

puted approval with some particularity, because I attach importance at the very beginning of federal regulation of the natural gas industry to approaching it as the performance of economic functions, not as the performance of legalistic rituals.

## I.

Solutions of these cases must consider eccentricities of the industry which gives rise to them and also to the Act of Congress by which they are governed.

The heart of this problem is the elusive, exhaustible, and irreplaceable nature of natural gas itself. Given sufficient money, we can produce any desired amount of railroad, bus, or steamship transportation, or communications facilities, or capacity for generation of electric energy, or for the manufacture of gas of a kind. In the service of such utilities one customer has little concern with the amount taken by another, one's waste will not deprive another, a volume of service can be created equal to demand, and today's demands will not exhaust or lessen capacity to serve tomorrow. But the wealth of Midas and the wit of man cannot produce or reproduce a natural gas field. We cannot even reproduce the gas, for our manufactured product has only about half the heating value per unit of nature's own.[3]

Natural gas in some quantity is produced in twenty-four states. It is consumed in only thirty-five states, and is

---

dent investment theory may have influenced that conclusion. See opinion of Mr. Justice Frankfurter in *Driscoll* v. *Edison Light & Power Co.*, 307 U. S. 104, 122, and my brief as Solicitor General in that case. It should be noted, however, that these statements were made, not in a natural gas case, but in an electric power case—a very important distinction, as I shall try to make plain.

[3] Natural gas from the Appalachian field averages about 1,050 to 1,150 B. T. U. content, while by-product manufactured gas is about 530 to 540. Moody's Manual of Public Utilities (1943) 1,350; Youngberg, Natural Gas (1930) 7.

630

available only to about 7,600,000 consumers.[4] Its availability has been more localized than that of any other utility service because it has depended more on the caprice of nature.

The supply of the Hope Company is drawn from that old and rich and vanishing field that flanks the Appalachian mountains. Its center of production is Pennsylvania and West Virginia, with a fringe of lesser production in New York, Ohio, Kentucky, Tennessee, and the north end of Alabama. Oil was discovered in commercial quantities at a depth of only 69½ feet near Titusville, Pennsylvania, in 1859. Its value then was about $16 per barrel.[5] The oil branch of the petroleum industry went forward at once, and with unprecedented speed. The area productive of oil and gas was roughed out by the drilling of over 19,000 "wildcat" wells, estimated to have cost over $222,000,000. Of these, over 18,000, or 94.9 per cent, were "dry holes." About five per cent, or 990 wells, made discoveries of commercial importance, 767 of them resulting chiefly in oil and 223 in gas only.[6] Prospecting for many years was a search for oil, and to strike gas was a misfortune. Waste during this period and even later is appalling. Gas was regarded as having no commercial value until about 1882, in which year the total yield was valued only at about $75,000.[7] Since then, contrary to oil, which has become cheaper, gas in this field has pretty steadily advanced in price.

While for many years natural gas had been distributed on a small scale for lighting,[8] its acceptance was slow,

[4] Sen. Rep. No. 1162, 75th Cong., 1st Sess., 2.

[5] Arnold and Kemnitzer, Petroleum in the United States and Possessions (1931) 78.

[6] Id. at 62–63.

[7] Id., at 61.

[8] At Fredonia, New York, in 1821, natural gas was conveyed from a shallow well to some thirty people. The lighthouse at Barcelona Harbor, near what is now Westfield, New York, was at about that

facilities for its utilization were primitive, and not until 1885 did it take on the appearance of a substantial industry.[9] Soon monopoly of production or markets developed.[10] To get gas from the mountain country, where it was largely found, to centers of population, where it was in demand, required very large investment. By ownership of such facilities a few corporate systems, each including several companies, controlled access to markets. Their purchases became the dominating factor in giving a market value to gas produced by many small operators. Hope is the market for over 300 such operators. By 1928 natural gas in the Appalachian field commanded an average price of 21.1 cents per m. c. f. at points of production and was bringing 45.7 cents at points of consumption.[11] The companies which controlled markets, however, did not rely on gas purchases alone. They acquired and held in fee or leasehold great acreage in territory proved by "wildcat" drilling. These large marketing system companies as well as many small independent owners and operators have carried on the commercial development of proved territory. The development risks appear from the estimate that up to 1928, 312,318 proved area wells had been sunk in the Appalachian field of which 48,962, or 15.7 per cent, failed to produce oil or gas in commercial quantity.[12]

---

time and for many years afterward lighted by gas that issued from a crevice. Report on Utility Corporations by Federal Trade Commission, Sen. Doc. 92, Pt. 84-A, 70th Cong., 1st Sess., 8-9.

[9] In that year Pennsylvania enacted "An Act to provide for the incorporation and regulation of natural gas companies." Penn. Laws 1885, No. 32.

[10] See Steptoe and Hoffheimer's Memorandum for Governor Cornwell of West Virginia (1917) 25 West Virginia Law Quarterly 257; see also Report on Utility Corporations by Federal Trade Commssion, Sen. Doc. No. 92, Pt. 84-A, 70th Cong., 1st Sess.

[11] Arnold and Kemnitzer, Petroleum in the United States and Possessions (1931) 73.

[12] Id. at 63.

With the source of supply thus tapped to serve centers of large demand, like Pittsburgh, Buffalo, Cleveland, Youngstown, Akron, and other industrial communities, the distribution of natural gas fast became big business. Its advantages as a fuel and its price commended it, and the business yielded a handsome return. All was merry and the goose hung high for consumers and gas companies alike until about the time of the first World War. Almost unnoticed by the consuming public, the whole Appalachian field passed its peak of production and started to decline. Pennsylvania, which to 1928 had given off about 38 per cent of the natural gas from this field, had its peak in 1905; Ohio, which had produced 14 per cent, had its peak in 1915; and West Virginia, greatest producer of all, with 45 per cent to its credit, reached its peak in 1917.[13]

Western New York and Eastern Ohio, on the fringe of the field, had some production but relied heavily on imports from Pennsylvania and West Virginia. Pennsylvania, a producing and exporting state, was a heavy consumer and supplemented her production with imports from West Virginia. West Virginia was a consuming state, but the lion's share of her production was exported. Thus the interest of the states in the North Appalachian supply was in conflict.

Competition among localities to share in the failing supply and the helplessness of state and local authorities in the presence of state lines and corporate complexities is a part of the background of federal intervention in the industry.[14] West Virginia took the boldest measure. It legislated a priority in its entire production in favor of its own inhabitants. That was frustrated by an injunc-

---

[13] *Id.* at 64.

[14] See Report on Utility Corporations by Federal Trade Commission, Sen. Doc. No. 92, Pt. 84–A, 70th Cong., 1st Sess.

tion from this Court.[15]   Throughout the region clashes in the courts and conflicting decisions evidenced public anxiety and confusion.   It was held that the New York Public Service Commission did not have power to classify consumers and restrict their use of gas.[16]   That Commission held that a company could not abandon a part of its territory and still serve the rest.[17]   Some courts admonished the companies to take action to protect consumers.[18]   Several courts held that companies, regardless of failing supply, must continue to take on customers, but such compulsory additions were finally held to be within the Public Service Commission's discretion.[19] There were attempts to throw up franchises and quit the service, and municipalities resorted to the courts with conflicting results.[20]   Public service commissions of consuming states were handicapped, for they had no control of the supply.[21]

---

[15] *Pennsylvania* v. *West Virginia*, 262 U. S. 553.   For conditions there which provoked this legislation, see 25 West Virginia Law Quarterly 257.

[16] *People ex rel. Pavilion Gas Co.* v. *Public Service Commission*, 188 App. Div. 36, 176 N. Y. S. 163.

[17] Village of Falconer *v.* Pennsylvania Gas Co., 17 State Department Reports (N. Y.) 407.

[18] See, for example, *Public Service Commission* v. *Iroquois Natural Gas Co.*, 108 Misc. 696, 178 N. Y. S. 24; *Park Abbott Realty Co.* v. *Iroquois Gas Co.*, 102 Misc. 266, 168 N. Y. S. 673; *Public Service Commission* v. *Iroquois Natural Gas Co.*, 189 App. Div. 545, 179 N. Y. S. 230.

[19] *People ex rel. Pennsylvania Gas Co.* v. *Public Service Commission*, 196 App. Div. 514, 189 N. Y. S. 478.

[20] *East Ohio Gas Co.* v. *Akron*, 81 Ohio St. 33, 90 N. E. 40; *Newcomerstown* v. *Consolidated Gas Co.*, 100 Ohio St. 494, 127 N. E. 414; *Gress* v. *Village of Ft. Loramie*, 100 Ohio St. 35, 125 N. E. 112; *Jamestown* v. *Pennsylvania Gas Co.*, 263 F. 437, 264 F. 1009.   See also *United Fuel Gas Co.* v. *Railroad Commission*, 278 U. S. 300, 308.

[21] The New York Public Service Commission said: "While the transportation of natural gas through pipe lines from one state to another

Shortages during World War I occasioned the first intervention in the natural gas industry by the Federal Government. Under Proclamation of President Wilson the United States Fuel Administrator took control, stopped extensions, classified consumers and established a priority for domestic over industrial use.[22] After the war federal control was abandoned. Some cities once served with natural gas became dependent upon a mixed gas of reduced heating value and relatively higher price.[23]

Utilization of natural gas of highest social as well as economic return is domestic use for cooking and water

state is interstate commerce . . ., Congress has not taken over the regulation of that particular industry. Indeed, it has expressly excepted it from the operation of the Interstate Commerce Commissions Law (Interstate Commerce Commissions Law, section 1). It is quite clear, therefore, that this Commission can not require a Pennsylvania corporation producing gas in Pennsylvania to transport it and deliver it in the State of New York, and that the Interstate Commerce Commission is likewise powerless. If there exists such a power, and it seems that there does, it is a power vested in Congress and by it not yet exercised. There is no available source of supply for the Crystal City Company at present except through purchasing from the Potter Gas Company. It is possible that this Commission might fix a price at which the Potter Gas Company should sell if it sold at all, but as the Commission can not require it to supply gas in the State of New York, the exercise of such a power to fix the price, if such power exists, would merely say, sell at this price or keep out of the State." Lane v. Crystal City Gas Co., 8 New York Public Service Comm. Reports, Second District, 210, 212.

[22] Proclamation by the President of September 16, 1918; Rules and Regulations of H. A. Garfield, Fuel Administrator, September 24, 1918.

[23] For example, the Iroquois Gas Corporation which formerly served Buffalo, New York, with natural gas ranging from 1050 to 1150 b. t. u. per cu. ft., now mixes a by-product gas of between 530 and 540 b. t. u. in proportions to provide a mixed gas of about 900 b. t. u. per cu. ft. For space heating or water heating its charges range from 65 cents for the first 10 m. c. f. per month to 55 cents for all above 25 m. c. f. per month. Moody's Manual of Public Utilities (1943) 1350.

heating, followed closely by use for space heating in homes. This is the true public utility aspect of the enterprise, and its preservation should be the first concern of regulation. Gas does the family cooking cheaper than any other fuel.[24] But its advantages do not end with dollars and cents cost. It is delivered without interruption at the meter as needed and is paid for after it is used. No money is tied up in a supply, and no space is used for storage. It requires no handling, creates no dust, and leaves no ash. It responds to thermostatic control. It ignites easily and immediately develops its maximum heating capacity. These incidental advantages make domestic life more liveable.

Industrial use is induced less by these qualities than by low cost in competition with other fuels. Of the gas exported from West Virginia by the Hope Company a very substantial part is used by industries. This wholesale use speeds exhaustion of supply and displaces other fuels. Coal miners and the coal industry, a large part of whose costs are wages, have complained of unfair competition from low-priced industrial gas produced with relatively little labor cost.[25]

Gas rate structures generally have favored industrial users. In 1932, in Ohio, the average yield on gas for domestic consumption was 62.1 cents per m. c. f. and on in-

---

[24] The United States Fuel Administration made the following cooking value comparisons, based on tests made in the Department of Home Economics of Ohio State University:

Natural gas at 1.12 per M. is equivalent to coal at $6.50 per ton.

Natural gas at 2.00 per M. is equivalent to gasoline at 27¢ per gal.

Natural gas at 2.20 per M. is equivalent to electricity at 3¢ per k. w. h.

Natural gas at 2.40 per M. is equivalent to coal oil at 15¢ per gal.

Use and Conservation of Natural Gas, issued by U. S. Fuel Administration (1918) 5.

[25] See Brief on Behalf of Legislation Imposing an Excise Tax on Natural Gas, submitted to N. R. A. by the United Mine Workers of America and the National Coal Association.

dustrial, 38.7. In Pennsylvania, the figures were 62.9 against 31.7. West Virginia showed the least spread, domestic consumers paying 36.6 cents; and industrial, 27.7.[26] Although this spread is less than in other parts of the United States,[27] it can hardly be said to be self-justifying. It certainly is a very great factor in hastening decline of the natural gas supply.

About the time of World War I there were occasional and short-lived efforts by some hard-pressed companies to reverse this discrimination and adopt graduated rates, giving a low rate to quantities adequate for domestic use and graduating it upward to discourage industrial use.[28]

---

[26] Brief of National Gas Association and United Mine Workers, *supra* note 26, pp. 35, 36, compiled from Bureau of Mines Reports.

[27] From the source quoted in the preceding note the spread elsewhere is shown to be:

| State | Industrial | Domestic |
|-------|-----------|----------|
| Illinois | 29.2 | 1.678 |
| Louisiana | 10.4 | 59.7 |
| Oklahoma | 11.2 | 41.5 |
| Texas | 13.1 | 59.7 |
| Alabama | 17.8 | 1.227 |
| Georgia | 22.9 | 1.043 |

[28] In Corning, New York, rates were initiated by the Crystal City Gas Company as follows: 70¢ for the first 5,000 cu. ft. per month; 80¢ from 5,000 to 12,000; $1.00 for all over 12,000. The Public Service Commission rejected these rates and fixed a flat rate of 58¢ per m. c. f. Lane *v.* Crystal City Gas Co., 8 New York Public Service Comm. Reports, Second District, 210.

The Pennsylvania Gas Company (National Fuel Gas Company group) also attempted a sliding scale rate for New York consumers, net per month as follows: First 5,000 feet, 35¢; second 5,000 feet, 45¢; third 5,000 feet, 50¢; all above 15,000, 55¢. This was eventually abandoned, however. The company's present scale in Pennsylvania appears to be reversed to the following net monthly rate: first 3 m. c. f., 75¢; next 4 m. c. f., 60¢; next 8 m. c. f., 55¢; over 15 m. c. f., 50¢. Moody's Manual of Public Utilities (1943) 1350. In New York it now serves a mixed gas.

For a study of effect of sliding scale rates in reducing consumption see 11 Proceedings of Natural Gas Association of America (1919) 287.

These rates met opposition from industrial sources, of course, and since diminished revenues from industrial sources tended to increase the domestic price, they met little popular or commission favor. The fact is that neither the gas companies nor the consumers nor local regulatory bodies can be depended upon to conserve gas. Unless federal regulation will take account of conservation, its efforts seem, as in this case, actually to constitute a new threat to the life of the Appalachian supply.

## II.

Congress in 1938 decided upon federal regulation of the industry. It did so after an exhaustive investigation of all aspects including failing supply and competition for the use of natural gas intensified by growing scarcity.[29] Pipelines from the Appalachian area to markets were in the control of a handful of holding company systems.[30] This created a highly concentrated control of the producers' market and of the consumers' supplies. While holding companies dominated both production and distribution they segregated those activities in separate

---

[29] See Report on Utility Corporations by Federal Trade Commission, Sen. Doc. 92, Pt. 84-A, 70th Cong., 1st Sess.

[30] Four holding company systems control over 55 per cent of all natural gas transmission lines in the United States. They are Columbia Gas and Electric Corporation, Cities Service Co., Electric Bond and Share Co., and Standard Oil Co. of New Jersey. Columbia alone controls nearly 25 per cent, and fifteen companies account for over 80 per cent of the total. Report on Utility Corporations by Federal Trade Commission, Sen. Doc. 92, Pt. 84-A, 70th Cong., 1st Sess., 28.

In 1915, so it was reported to the Governor of West Virginia, 87 per cent of the total gas production of that state was under control of eight companies. Steptoe and Hoffheimer, Legislative Regulation of Natural Gas Supply in West Virginia, 17 West Virginia Law Quarterly 257, 260. Of these, three were subsidiaries of the Columbia system and others were subsidiaries of larger systems. In view of inter-system sales and interlocking interests it may be doubted whether there is much real competition among these companies.

subsidiaries,[31] the effect of which, if not the purpose, was to isolate some end of the business from the reach of any one state commission. The cost of natural gas to consumers moved steadily upwards over the years, out of proportion to prices of oil, which, except for the element of competition, is produced under somewhat comparable conditions. The public came to feel that the companies were exploiting the growing scarcity of local gas. The problems of this region had much to do with creating the demand for federal regulation.

The Natural Gas Act declared the natural gas business to be "affected with a *public interest*," and its regulation "necessary in the *public interest*."[32] Originally, and at the time this proceeding was commenced and tried, it also declared "the intention of Congress that natural gas shall be sold in interstate commerce for resale for ultimate public consumption for domestic, commercial, industrial, or any other use at the lowest possible reasonable rate *consistent with the maintenance of adequate service in the public interest*."[33] While this was later dropped, there is nothing to indicate that it was not and is not still an accurate statement of purpose of the Act. Extension or improvement of facilities may be ordered when "necessary or desirable in the public interest," abandonment of facilities may be ordered when the supply is "depleted to the extent that the continuance of service is unwarranted, or that the *present or future public convenience or necessity*

---

[31] This pattern with its effects on local regulatory efforts will be observed in our decisions. See *United Fuel Gas Co.* v. *Railroad Commission*, 278 U. S. 300; *United Fuel Gas Co.* v. *Public Service Commission*, 278 U. S. 322; *Dayton Power & Light Co.* v. *Public Utilities Commission*, 292 U. S. 290; *Columbus Gas & Fuel Co.* v. *Public Utilities Commission*, 292 U. S. 398, and the present case.

[32] 15 U. S. C. § 717 (a). (Italics supplied throughout this paragraph.)

[33] § 7 (c), 52 Stat. 825.

permit" abandonment and certain extensions can only be made on finding of "the *present or future* convenience and necessity." [34] The Commission is required to take account of the ultimate use of the gas. Thus it is given power to suspend new schedules as to rates, charges, and classification of services except where the schedules are for the sale of gas "for resale for industrial use only," [35] which gives the companies greater freedom to increase rates on industrial gas than on domestic gas. More particularly, the Act expressly forbids any undue preference or advantage to any person or *"any unreasonable difference in rates . . .* either as between localities *or as between classes of service."* [36] And the power of the Commission expressly includes that to determine the "just and reasonable *rate, charge, classification, rule, regulation, practice, or contract* to be thereafter observed and in force." [37]

In view of the Court's opinion that the Commission in administering the Act may ignore discrimination, it is interesting that in reporting this Bill both the Senate and the House Committees on Interstate Commerce pointed out that in 1934, on a nation-wide average the price of natural gas per m. c. f. was 74.6 cents for domestic use, 49.6 cents for commercial use, and 16.9 for industrial use. [38] I am not ready to think that supporters of a bill called attention to the striking fact that householders were being charged five times as much for their gas as industrial users only as a situation which the Bill would do nothing to remedy. On the other hand the Act gave to the Commission what the Court aptly describes as "broad powers of regulation."

---

[34] 15 U. S. C. § 717f.

[35] *Id.,* § 717c (e).

[36] *Id.,* § 717c (b).

[37] *Id.,* § 717d (a).

[38] Sen. Rep. No. 1162, 75th Cong., 1st Sess., 2.

### III.

This proceeding was initiated by the Cities of Cleveland and Akron. They alleged that the price charged by Hope for natural gas "for resale to domestic, commercial and small industrial consumers in Cleveland and elsewhere is excessive, unjust, unreasonable, greatly in excess of the price charged by Hope to nonaffiliated companies at wholesale for resale to domestic, commercial, and small industrial consumers, and *greatly in excess of the price charged by Hope to East Ohio for resale to certain favored industrial consumers in Ohio, and therefore is further unduly discriminatory between customers and between classes of service"* (italics supplied). The company answered admitting differences in prices to affiliated and nonaffiliated companies and justifying them by differences in conditions of delivery. As to the allegation that the contract price is "greatly in excess of the price charged by Hope to East Ohio for resale to certain favored industrial consumers in Ohio," Hope did not deny a price differential, but alleged that industrial gas was not sold to "favored consumers" but was sold under contracts and schedules filed with and approved by the Public Utilities Commission of Ohio, and that certain conditions of delivery made it not "unduly discriminatory."

The record shows that in 1940 Hope delivered for industrial consumption 36,523,792 m. c. f. and for domestic and commercial consumption, 50,343,652 m. c. f. I find no separate figure for domestic consumption. It served 43,767 domestic consumers directly, 511,521 through the East Ohio Gas Company, and 154,043 through the Peoples Natural Gas Company, both affiliates owned by the same parent. Its special contracts for industrial consumption, so far as appear, are confined to about a dozen big industries.

Hope is responsible for such discrimination as exists in favor of these few industrial consumers. It controls both the resale price and use of industrial gas by virtue of the very interstate sales contracts over which the Commission is exercising its jurisdiction.

Hope's contract with East Ohio Company is an example. Hope agrees to deliver, and the Ohio Company to take, "(a) all natural gas requisite for the supply of the domestic consumers of the Ohio Company; (b) such amounts of natural gas as may be requisite to fulfill contracts made with the consent and approval of the Hope Company by the Ohio Company, or companies which it supplies with natural gas, for the sale of gas upon special terms and conditions for manufacturing purposes." The Ohio Company is required to read domestic customers' meters once a month and meters of industrial customers daily and to furnish all meter readings to Hope. The Hope Company is to have access to meters of all consumers and to all of the Ohio Company's accounts. The domestic consumers of the Ohio Company are to be fully supplied in preference to consumers purchasing for manufacturing purposes and "Hope Company can be required to supply gas to be used for manufacturing purposes only where the same is sold under special contracts which have first been submitted to and approved in writing by the Hope Company and which expressly provide that natural gas will be supplied thereunder only in so far as the same is not necessary to meet the requirements of domestic consumers supplied through pipe lines of the Ohio Company." This basic contract was supplemented from time to time, chiefly as to price. The last amendment was in a letter from Hope to East Ohio in 1937. It contained a special discount on industrial gas and a schedule of special industrial contracts, Hope reserving the right to make eliminations therefrom and agreeing that others might be added from time to

time with its approval in writing. It said, "It is believed that the price concessions contained in this letter, *while not based on our costs,* are, under certain conditions, to our mutual advantage in maintaining and building up the volumes of gas sold by us [italics supplied]." [39]

The Commission took no note of the charges of discrimination and made no disposition of the issue tendered on this point. It ordered a flat reduction in the price per m. c. f. of all gas delivered by Hope in interstate commerce. It made no limitation, condition, or provision as to what classes of consumers should get the benefit of the reduction. While the cities have accepted and are defending the reduction, it is my view that the discrimination of which they have complained is perpetuated and increased by the order of the Commission and that it violates the Act in so doing.

The Commission's opinion aptly characterizes its entire objective by saying that "bona fide investment figures now become all-important in the regulation of rates." It should be noted that the all-importance of this theory is not the result of any instruction from Congress. When the Bill to regulate gas was first before Congress it con-

---

[39] The list of East Ohio Gas Company's special industrial contracts thus expressly under Hope's control and their demands are as follows:

| Customer | Ordinary Daily Requirements. |
|---|---|
| Republic Steel Corporation | 15, 000, 000 cu. ft. |
| Otis Steel Company | 10, 000, 000 |
| Timken Roller Bearing Co | 7, 500, 000 |
| Youngstown Sheet & Tube Co | 7, 000, 000 |
| U. S. Steel Corp.—Subsidiaries | 6, 500, 000 |
| General Electric Company | 2, 500, 000 |
| Pittsburgh Plate Glass Co | 2, 000, 000 |
| Niles Rolling Mill Company | 1, 500, 000 |
| Chase Brass & Copper Company | 700, 000 |
| U. S. Aluminum Company | 400, 000 |
| Mahoning Valley Steel Company | 400, 000 |
| Babcock & Wilcox Company | 400, 000 |
| Canton Stamping & Enameling Co | 350, 000 |

tained the following: "In determining just and reasonable rates the Commission shall fix such rate as will allow a fair return upon the actual legitimate prudent cost of the property used and useful for the service in question." H. R. 5423, 74th Cong., 1st Sess., Title III, § 312 (c). Congress rejected this language. See H. R. 5423, § 213 (211 (c)), and H. R. Rep. No. 1318, 74th Cong., 1st Sess., 30.

The Commission contends nevertheless that the "all important" formula for finding a rate base is that of prudent investment. But it excluded from the investment base an amount actually and admittedly invested of some $17,000,000. It did so because it says that the Company recouped these expenditures from customers before the days of regulation from earnings above a fair return. But it would not apply all of such "excess earnings" to reduce the rate base as one of the Commissioners suggested. The reason for applying excess earnings to reduce the investment base roughly from $69,000,000 to $52,000,000 but refusing to apply them to reduce it from that to some $18,000,000 is not found in a difference in the character of the earnings or in their reinvestment. The reason assigned is a difference in bookkeeping treatment many years before the Company was subject to regulation. The $17,000,000, reinvested chiefly in well drilling, was treated on the books as expense. (The Commission now requires that drilling costs be carried to capital account.) The allowed rate base thus actually was determined by the Company's bookkeeping, not its investment. This attributes a significance to formal classification in account keeping that seems inconsistent with rational rate regulation.[40] Of

---

[40] To make a fetish of mere accounting is to shield from examination the deeper causes, forces, movements, and conditions which should govern rates. Even as a recording of current transactions, bookkeeping is hardly an exact science. As a representation of the condition and trend of a business, it uses symbols of certainty to express values

course, the Commission would not and should not allow a rate base to be inflated by bookkeeping which had improperly capitalized expenses. I have doubts about resting public regulation upon any rule that is to be used or not depending on which side it favors.

that actually are in constant flux. It may be said that in commercial or investment banking or any business extending credit success depends on knowing what not to believe in accounting. Few concerns go into bankruptcy or reorganization whose books do not show them solvent and often even profitable. If one cannot rely on accountancy accurately to disclose past or current conditions of a business, the fallacy of using it as a sole guide to future price policy ought to be apparent. However, our quest for certitude is so ardent that we pay an irrational reverence to a technique which uses symbols of certainty, even though experience again and again warns us that they are delusive. Few writers have ventured to challenge this American idolatry, but see Hamilton, Cost as a Standard for Price, 4 Law and Contemporary Problems 321, 323–25. He observes that "As the apostle would put it, accountancy is all things to all men. . . . Its purpose determines the character of a system of accounts." He analyzes the hypothetical character of accounting and says "It was no eternal mold for pecuniary verities handed down from on high. It was—like logic, or algebra, or the device of analogy in the law—an ingenious contrivance of the human mind to serve a limited and practical purpose." "Accountancy is far from being a pecuniary expression of all that is industrial reality. It is an instrument, highly selective in its application, in the service of the institution of money making." As to capital account he observes "In an enterprise in lusty competition with others of its kind, survival is the thing and the system of accounts has its focus in solvency. . . . Accordingly depreciation, obsolescence, and other factors which carry no immediate threat are matters of lesser concern and the capital account is likely to be regarded as a secondary phenomenon. . . . But in an enterprise, such as a public utility, where continued survival seems assured, solvency is likely to be taken for granted. . . . A persistent and ingenious attention is likely to be directed not so much to securing the upkeep of the physical property as to making it certain that capitalization fails in not one whit to give full recognition to every item that should go into the account."

The Company on the other hand, has not put its gas fields into its calculations on the present-value basis, although that, it contends, is the only lawful rule for finding a rate base. To do so would result in a rate higher than it has charged or proposes as a matter of good business to charge.

The case before us demonstrates the lack of rational relationship between conventional rate-base formulas and natural gas production and the extremities to which regulating bodies are brought by the effort to rationalize them. The Commission and the Company each stands on a different theory, and neither ventures to carry its theory to logical conclusion as applied to gas fields.

## IV.

This order is under judicial review not because we interpose constitutional theories between a State and the business it seeks to regulate, but because Congress put upon the federal courts a duty toward administration of a new federal regulatory Act. If we are to hold that a given rate is reasonable just because the Commission has said it was reasonable, review becomes a costly, time-consuming pageant of no practical value to anyone. If on the other hand we are to bring judgment of our own to the task, we should for the guidance of the regulators and the regulated reveal something of the philosophy, be it legal or economic or social, which guides us. We need not be slaves to a formula but unless we can point out a rational way of reaching our conclusions they can only be accepted as resting on intuition or predilection. I must admit that I possess no instinct by which to know the "reasonable" from the "unreasonable" in prices and must seek some conscious design for decision.

The Court sustains this order as reasonable, but what makes it so or what could possibly make it otherwise,

I cannot learn. It holds that: "it is the result reached not the method employed which is controlling"; "the fact that the method employed to reach that result may contain infirmities is not then important" and it is not "important to this case to determine the various permissible ways in which any rate base on which the return is computed might be arrived at." The Court does lean somewhat on considerations of capitalization and dividend history and requirements for dividends on outstanding stock. But I can give no real weight to that for it is generally and I think deservedly in discredit as any guide in rate cases.[41]

Our books already contain so much talk of methods of rationalizing rates that we must appear ambiguous if we announce results without our working methods. We are confronted with regulation of a unique type of enterprise which I think requires considered rejection of much conventional utility doctrine and adoption of concepts of "just and reasonable" rates and practices and of the "public interest" that will take account of the peculiarities of the business.

The Court rejects the suggestions of this opinion. It says that the Committees in reporting the bill which became the Act said it provided "for regulation along recognized and more or less standardized lines" and that there was "nothing novel in its provisions." So saying it sustains a rate calculated on a novel variation of a rate base theory which itself had at the time of enactment of the legislation been recognized only in dissenting opinions. Our difference seems to be between unconscious innovation,[42] and the purposeful and deliberate innovation I

---

[41] See 2 Bonbright, Valuation of Property (1937) 1112.

[42] Bonbright says, ". . . the vice of traditional law lies, not in its adoption of excessively rigid concepts of value and rules of valuation, but rather in its tendency to permit shifts in meaning that are inept, or else that are ill-defined because the judges that make them will not openly admit that they are doing so." *Id.*, 1170.

would make to meet the necessities of regulating the industry before us.

Hope's business has two components of quite divergent character. One, while not a conventional common-carrier undertaking, is essentially a transportation enterprise consisting of conveying gas from where it is produced to point of delivery to the buyer. This is a relatively routine operation not differing substantially from many other utility operations. The service is produced by an investment in compression and transmission facilities. Its risks are those of investing in a tested means of conveying a discovered supply of gas to a known market. A rate base calculated on the prudent investment formula would seem a reasonably satisfactory measure for fixing a return from that branch of the business whose service is roughly proportionate to the capital invested. But it has other consequences which must not be overlooked. It gives marketability and hence "value" to gas owned by the company and gives the pipeline company a large power over the marketability and hence "value" of the production of others.

The other part of the business—to reduce to possession an adequate supply of natural gas—is of opposite character, being more erratic and irregular and unpredictable in relation to investment than any phase of any other utility business. A thousand feet of gas captured and severed from real estate for delivery to consumers is recognized under our law as property of much the same nature as a ton of coal, a barrel of oil, or a yard of sand. The value to be allowed for it is the real battleground between the investor and consumer. It is from this part of the business that the chief difference between the parties as to a proper rate base arises.

Is it necessary to a "reasonable" price for gas that it be anchored to a rate base of any kind? Why did courts in the first place begin valuing "rate bases" in order to "value" something else? The method came into vogue

in fixing rates for transportation service which the public obtained from common carriers. The public received none of the carriers' physical property but did make some use of it. The carriage was often a monopoly so there were no open market criteria as to reasonableness. The "value" or "cost" of what was put to use in the service by the carrier was not a remote or irrelevant consideration in making such rates. Moreover the difficulty of appraising an intangible service was thought to be simplified if it could be related to physical property which was visible and measurable and the items of which might have market value. The court hoped to reason from the known to the unknown. But gas fields turn this method topsy turvy. Gas itself is tangible, possessible, and does have a market and a price in the field. The value of the rate base is more elusive than that of gas. It consists of intangibles—leaseholds and freeholds—operated and unoperated—of little use in themselves except as rights to reach and capture gas. Their value lies almost wholly in predictions of discovery, and of price of gas when captured, and bears little relation to cost of tools and supplies and labor to develop it. Gas is what Hope sells and it can be directly priced more reasonably and easily and accurately than the components of a rate base can be valued. Hence the reason for resort to a roundabout way of rate base price fixing does not exist in the case of gas in the field.

But if found, and by whatever method found, a rate base is little help in determining reasonableness of the price of gas. Appraisal of present value of these intangible rights to pursue fugitive gas depends on the value assigned to the gas when captured. The "present fair value" rate base, generally in ill repute,[43] is not even urged by the gas company for valuing its fields.

[43] "The attempt to regulate rates by reference to a periodic or occasional reappraisal of the properties has now been tested long enough

The prudent investment theory has relative merits in fixing rates for a utility which creates its service merely by its investment. The amount and quality of service rendered by the usual utility will, at least roughly, be measured by the amount of capital it puts into the enterprise. But it has no rational application where there is no such relationship between investment and capacity to serve. There is no such relationship between investment and amount of gas produced. Let us assume that Doe and Roe each produces in West Virginia for delivery to Cleveland the same quantity of natural gas per day. Doe, however, through luck or foresight or whatever it takes, gets his gas from investing $50,000 in leases and drilling. Roe drilled poorer territory, got smaller wells, and has invested $250,000. Does anybody imagine that Roe can get or ought to get for his gas five times as much as Doe because he has spent five times as much? The service one renders to society in the gas business is measured by what he gets out of the ground, not by what he puts into it, and there is little more relation between the investment and the results than in a game of poker.

Two-thirds of the gas Hope handles it buys from about 340 independent producers. It is obvious that the principle of rate-making applied to Hope's own gas cannot be applied, and has not been applied, to the bulk of the gas Hope delivers. It is not probable that the investment of any two of these producers will bear the same ratio to their investments. The gas, however, all goes to the same use, has the same utilization value and the same ultimate price.

To regulate such an enterprise by undiscriminatingly transplanting any body of rate doctrine conceived and

---

to confirm the worst fears of its critics. Unless its place is taken by some more promising scheme of rate control, the days of private ownership under government regulation may be numbered." 2 Bonbright, Valuation of Property (1937) 1190.

adapted to the ordinary utility business can serve the "public interest" as the Natural Gas Act requires, if at all, only by accident. Mr. Justice Brandeis, the pioneer juristic advocate of the prudent investment theory for man-made utilities, never, so far as I am able to discover, proposed its application to a natural gas case. On the other hand, dissenting in *Pennsylvania* v. *West Virginia,* he reviewed the problems of gas supply and said, "In no other field of public service regulation is the controlling body confronted with factors so baffling as in the natural gas industry; and in none is continuous supervision and control required in so high a degree." 262 U. S. 553, 621. If natural gas rates are intelligently to be regulated we must fit our legal principles to the economy of the industry and not try to fit the industry to our books.

As our decisions stand the Commission was justified in believing that it was required to proceed by the rate base method even as to gas in the field. For this reason the Court may not merely wash its hands of the method and rationale of rate making. The fact is that this Court, with no discussion of its fitness, simply transferred the rate base method to the natural gas industry. It happened in *Newark Natural Gas & Fuel Co.* v. *City of Newark, Ohio,* 242 U. S. 405 (1917), in which the company wanted 25 cents per m. c. f., and under the Fourteenth Amendment challenged the reduction to 18 cents by ordinance. This Court sustained the reduction because the court below "gave careful consideration to the questions of the value of the property at the time of the inquiry," and whether the rate "would be sufficient to provide a fair return on the value of the property." The Court said this method was "based upon principles thoroughly established by repeated decisions of this court," citing many cases, not one of which involved natural gas or a comparable wasting natural resource. Then came issues as to state power to

regulate as affected by the commerce clause. *Public Utilities Commission* v. *Landon,* 249 U. S. 236 (1919); *Pennsylvania Gas Co.* v. *Public Service Commission,* 252 U. S. 23 (1920). These questions settled, the Court again was called upon in natural gas cases to consider state rate-making claimed to be invalid under the Fourteenth Amendment. *United Fuel Gas Co.* v. *Railroad Commission of Kentucky,* 278 U. S. 300 (1929); *United Fuel Gas Co.* v. *Public Service Commission of West Virginia,* 278 U. S. 322 (1929). Then, as now, the differences were "due chiefly to the difference in value ascribed by each to the gas rights and leaseholds." 278 U. S. 300, 311. No one seems to have questioned that the rate base method must be pursued and the controversy was as to what rate base must be used. Later the "value" of gas in the field was questioned in determining the amount a regulated company should be allowed to pay an affiliate therefor—a state determination also reviewed under the Fourteenth Amendment. *Dayton Power & Light Co.* v. *Public Utilities Commission of Ohio,* 292 U. S. 290 (1934); *Columbus Gas & Fuel Co.* v. *Public Utilities Commission of Ohio,* 292 U. S. 398 (1934). In both cases, one of which sustained and one of which struck down a fixed rate, the Court assumed the rate base method as the legal way of testing reasonableness of natural gas prices fixed by public authority, without examining its real relevancy to the inquiry.

Under the weight of such precedents we cannot expect the Commission to initiate economically intelligent methods of fixing gas prices. But the Court now faces a new plan of federal regulation based on the power to fix the price at which gas shall be allowed to move in interstate commerce. I should now consider whether these rules devised under the Fourteenth Amendment are the exclusive tests of a just and reasonable rate under the federal statute, inviting reargument directed to that point

if necessary. As I see it now I would be prepared to hold that these rules do not apply to a natural gas case arising under the Natural Gas Act.

Such a holding would leave the Commission to fix the price of gas in the field as one would fix maximum prices of oil or milk or coal, or any other commodity. Such a price is not calculated to produce a fair return on the synthetic value of a rate base of any individual producer, and would not undertake to assure a fair return to any producer. The emphasis would shift from the producer to the product, which would be regulated with an eye to average or typical producing conditions in the field.

Such a price fixing process on economic lines would offer little temptation to the judiciary to become back seat drivers of the price fixing machine. The unfortunate effect of judicial intervention in this field is to divert the attention of those engaged in the process from what is economically wise to what is legally permissible. It is probable that price reductions would reach economically unwise and self-defeating limits before they would reach constitutional ones. Any constitutional problems growing out of price fixing are quite different than those that have heretofore been considered to inhere in rate making. A producer would have difficulty showing the invalidity of such a fixed price so long as he voluntarily continued to sell his product in interstate commerce. Should he withdraw and other authority be invoked to compel him to part with his property, a different problem would be presented.

Allowance in a rate to compensate for gas removed from gas lands, whether fixed as of point of production or as of point of delivery, probably best can be measured by a functional test applied to the whole industry. For good or ill we depend upon private enterprise to exploit these natural resources for public consumption. The function which an allowance for gas in the field should perform

for society in such circumstances is to be enough and no more than enough to induce private enterprise completely and efficiently to utilize gas resources, to acquire for public service any available gas or gas rights and to deliver gas at a rate and for uses which will be in the future as well as in the present public interest.

The Court fears that "if we are now to tell the Commission to fix the rates so as to discourage particular uses, we would indeed be injecting into a rate case a 'novel' doctrine . . ." With due deference I suggest that there is nothing novel in the idea that any change in price of a service or commodity reacts to encourage or discourage its use. The question is not whether such consequences will or will not follow; the question is whether effects must be suffered blindly or may be intelligently selected, whether price control shall have targets at which it deliberately aims or shall be handled like a gun in the hands of one who does not know it is loaded.

We should recognize "price" for what it is—a tool, a means, an expedient. In public hands it has much the same economic effects as in private hands. Hope knew that a concession in industrial price would tend to build up its volume of sales. It used price as an expedient to that end. The Commission makes another cut in that same price but the Court thinks we should ignore the effect that it will have on exhaustion of supply. The fact is that in natural gas regulation price must be used to reconcile the private property right society has permitted to vest in an important natural resource with the claims of society upon it—price must draw a balance between wealth and welfare.

To carry this into techniques of inquiry is the task of the Commissioner rather than of the judge, and it certainly is no task to be solved by mere bookkeeping but requires the best economic talent available. There would doubtless be inquiry into the price gas is bringing in the

field, how far that price is established by arm's length bargaining and how far it may be influenced by agreements in restraint of trade or monopolistic influences. What must Hope really pay to get and to replace gas it delivers under this order? If it should get more or less than that for its own, how much and why? How far are such prices influenced by pipe line access to markets and if the consumers pay returns on the pipe lines how far should the increment they cause go to gas producers? East Ohio is itself a producer in Ohio.[44] What do Ohio authorities require Ohio consumers to pay for gas in the field? Perhaps these are reasons why the Federal Government should put West Virginia gas at lower or at higher rates. If so what are they? Should East Ohio be required to exploit its half million acres of unoperated reserve in Ohio before West Virginia resources shall be supplied on a devalued basis of which that State complains and for which she threatens measures of self keep? What is gas worth in terms of other fuels it displaces?

A price cannot be fixed without considering its effect on the production of gas. Is it an incentive to continue to exploit vast unoperated reserves? Is it conducive to deep drilling tests the result of which we may know only after trial? Will it induce bringing gas from afar to supplement or even to substitute for Appalachian gas?[45] Can it be had from distant fields as cheap or cheaper? If so, that competitive potentiality is certainly a relevant consideration. Wise regulation must also consider, as a private buyer would, what alternatives the producer has

[44] East Ohio itself owns natural gas rights in 550,600 acres, 518,526 of which are reserved and 32,074 operated, by 375 wells. Moody's Manual of Public Utilities (1943) 5.

[45] Hope has asked a certificate of convenience and necessity to lay 1,140 miles of 22-inch pipeline from Hugoton gas fields in southwest Kansas to West Virginia to carry 285 million cu. ft. of natural gas per day. The cost was estimated at $51,000,000. Moody's Manual of Public Utilities (1943) 1760.

if the price is not acceptable. Hope has intrastate business and domestic and industrial customers. What can it do by way of diverting its supply to intrastate sales? What can it do by way of disposing of its operated or reserve acreage to industrial concerns or other buyers? What can West Virginia do by way of conservation laws, severance or other taxation, if the regulated rate offends? It must be borne in mind that while West Virginia was prohibited from giving her own inhabitants a priority that discriminated against interstate commerce, we have never yet held that a good faith conservation act, applicable to her own, as well as to others, is not valid. In considering alternatives, it must be noted that federal regulation is very incomplete, expressly excluding regulation of "production or gathering of natural gas," and that the only present way to get the gas seems to be to call it forth by price inducements. It is plain that there is a downward economic limit on a safe and wise price.

But there is nothing in the law which compels a commission to fix a price at that "value" which a company might give to its product by taking advantage of scarcity, or monopoly of supply. The very purpose of fixing maximum prices is to take away from the seller his opportunity to get all that otherwise the market would award him for his goods. This is a constitutional use of the power to fix maximum prices, *Block* v. *Hirsh*, 256 U. S. 135; *Marcus Brown Holding Co.* v. *Feldman*, 256 U. S. 170; *International Harvester Co.* v. *Kentucky*, 234 U. S. 216; *Highland* v. *Russell Car & Snow Plow Co.*, 279 U. S. 253, just as the fixing of minimum prices of goods in interstate commerce is constitutional although it takes away from the buyer the advantage in bargaining which market conditions would give him. *United States* v. *Darby*, 312 U. S. 100; *Mulford* v. *Smith*, 307 U. S. 38; *United States* v. *Rock Royal Co-operative*, 307 U. S. 533; *Sunshine Anthracite Coal Co.* v. *Adkins*, 310 U. S. 381. The Commission has power to fix

a price that will be both maximum and minimum and it has the incidental right, and I think the duty, to choose the economic consequences it will promote or retard in production and also more importantly in consumption, to which I now turn.

If we assume that the reduction in company revenues is warranted we then come to the question of translating the allowed return into rates for consumers or classes of consumers. Here the Commission fixed a single rate for all gas delivered irrespective of its use despite the fact that Hope has established what amounts to two rates—a high one for domestic use and a lower one for industrial contracts.[46] The Commission can fix two prices for interstate gas as readily as one—a price for resale to domestic users and another for resale to industrial users. This is the pattern Hope itself has established in the very contracts over which the Commission is expressly given jurisdiction. Certainly the Act is broad enough to permit two prices to be fixed instead of one, if the concept of the "public interest" is not unduly narrowed.

The Commission's concept of the public interest in natural gas cases which is carried today into the Court's opinion was first announced in the opinion of the minority in the *Pipeline* case. It enumerated only two "phases of the public interest: (1) the investor interest; (2) the consumer interest," which it emphasized to the exclusion of all others. 315 U. S. 575, 606. This will do well enough in dealing with railroads or utilities supplying manufactured gas, electric power, a communications service or transportation, where utilization of facilities does not impair their future usefulness. Limitation of supply, however, brings into a natural gas case another phase of the public interest that to my mind overrides both the owner

---

[46] I find little information as to the rates for industries in the record and none at all in such usual sources as Moody's Manual.

and the consumer of that interest. Both producers and industrial consumers have served their immediate private interests at the expense of the long-range public interest. The public interest, of course, requires stopping unjust enrichment of the owner. But it also requires stopping unjust impoverishment of future generations. The public interest in the use by Hope's half million domestic consumers is quite a different one from the public interest in use by a baker's dozen of industries.

Prudent price fixing it seems to me must at the very threshold determine whether any part of an allowed return shall be permitted to be realized from sales of gas for resale for industrial use. Such use does tend to level out daily and seasonal peaks of domestic demand and to some extent permits a lower charge for domestic service. But is that a wise way of making gas cheaper when, in comparison with any substitute, gas is already a cheap fuel? The interstate sales contracts provide that at times when demand is so great that there is not enough gas to go around domestic users shall first be served. Should the operation of this preference await the day of actual shortage? Since the propriety of a preference seems conceded, should it not operate to prevent the coming of a shortage as well as to mitigate its effects? Should industrial use jeopardize tomorrow's service to householders any more than today's? If, however, it is decided to cheapen domestic use by resort to industrial sales, should they be limited to the few uses for which gas has special values or extend also to those who use it only because it is cheaper than competitive fuels? [47] And how much cheaper should indus-

---

[47] The Federal Power Commission has touched upon the problem of conservation in connection with an application for a certificate permitting construction of a 1,500-mile pipeline from southern Texas to New York City and says: "The Natural Gas Act as presently drafted does not enable the Commission to treat fully the serious implications of such a problem. The question should be raised as to whether the

trial gas sell than domestic gas, and how much advantage should it have over competitive fuels? If industrial gas is to contribute at all to lowering domestic rates, should it not be made to contribute the very maximum of which it is capable, that is, should not its price be the highest at which the desired volume of sales can be realized?

If I were to answer I should say that the household rate should be the lowest that can be fixed under commercial conditions that will conserve the supply for that use. The lowest probable rate for that purpose is not likely to speed exhaustion much, for it still will be high enough to induce economy, and use for that purpose has more nearly reached the saturation point. On the other hand the demand for industrial gas at present rates already appears to be increasing. To lower further the industrial rate is merely further to subsidize industrial consumption and speed depletion. The impact of the flat reduction

---

proposed use of natural gas would not result in displacing a less valuable fuel and create hardships in the industry already supplying the market, while at the same time rapidly depleting the country's natural-gas reserves. Although, for a period of perhaps 20 years, the natural gas could be so priced as to appear to offer an apparent saving in fuel costs, this would mean simply that social costs which must eventually be paid had been ignored.

"Careful study of the entire problem may lead to the conclusion that use of natural gas should be restricted by functions rather than by areas. Thus, it is especially adapted to space and water heating in urban homes and other buildings and to the various industrial heat processes which require concentration of heat, flexibility of control, and uniformity of results. Industrial uses to which it appears particularly adapted include the treating and annealing of metals, the operation of kilns in the ceramic, cement, and lime industries, the manufacture of glass in its various forms, and use as a raw material in the chemical industry. General use of natural gas under boilers for the production of steam is, however, under most circumstances of very questionable social economy." Twentieth Annual Report of the Federal Power Commission (1940) 79.

of rates ordered here admittedly will be to increase the industrial advantages of gas over competing fuels and to increase its use. I think this is not, and there is no finding by the Commission that it is, in the public interest.

There is no justification in this record for the present discrimination against domestic users of gas in favor of industrial users. It is one of the evils against which the Natural Gas Act was aimed by Congress and one of the evils complained of here by Cleveland and Akron. If Hope's revenues should be cut by some $3,600,000 the whole reduction is owing to domestic users. If it be considered wise to raise part of Hope's revenues by industrial purpose sales, the utmost possible revenue should be raised from the least consumption of gas. If competitive relationships to other fuels will permit, the industrial price should be substantially advanced, not for the benefit of the Company, but the increased revenues from the advance should be applied to reduce domestic rates. For in my opinion the "public interest" requires that the great volume of gas now being put to uneconomic industrial use should either be saved for its more important future domestic use or the present domestic user should have the full benefit of its exchange value in reducing his present rates.

Of course the Commission's power directly to regulate does not extend to the fixing of rates at which the local company shall sell to consumers. Nor is such power required to accomplish the purpose. As already pointed out, the very contract the Commission is altering classifies the gas according to the purposes for which it is to be resold and provides differentials between the two classifications. It would only be necessary for the Commission to order that all gas supplied under paragraph (a) of Hope's contract with the East Ohio Company shall be

at a stated price fixed to give to domestic service the entire reduction herein and any further reductions that may prove possible by increasing industrial rates. It might further provide that gas delivered under paragraph (b) of the contract for industrial purposes to those industrial customers Hope has approved in writing shall be at such other figure as might be found consistent with the public interest as herein defined. It is too late in the day to contend that the authority of a regulatory commission does not extend to a consideration of public interests which it may not directly regulate and a conditioning of its orders for their protection. *Interstate Commerce Commission* v. *Railway Labor Executives Assn.*, 315 U. S. 373; *United States* v. *Lowden,* 308 U. S. 225.

Whether the Commission will assert its apparently broad statutory authorization over prices and discriminations is, of course, its own affair, not ours. It is entitled to its own notion of the "public interest" and its judgment of policy must prevail. However, where there is ground for thinking that views of this Court may have constrained the Commission to accept the rate-base method of decision and a particular single formula as "all important" for a rate base, it is appropriate to make clear the reasons why I, at least, would not be so understood. The Commission is free to face up realistically to the nature and peculiarity of the resources in its control, to foster their duration in fixing price, and to consider future interests in addition to those of investors and present consumers. If we return this case it may accept or decline the proffered freedom. This problem presents the Commission an unprecedented opportunity if it will boldly make sound economic considerations, instead of legal and accounting theories, the foundation of federal policy. I would return the case to the Commission and thereby be clearly quit of what now may appear to be some responsibility for perpetrating a short-sighted pattern of natural gas regulation.