******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

ECKER, J., dissenting. I disagree with the majority's conclusion that the Public Utilities Regulatory Authority (PURA) acted within the scope of its authority under General Statutes § 16-243u when it applied the general rate-making principles of General Statutes § 16-19e to adjust the return on capital of GenConn Energy, LLC (GenConn). In my view, § 16-243u requires GenConn to recover its actual, prudently incurred cost of debt in full, a result that is wholly consistent with the principles of cost recovery set forth in § 16-19e. My analysis is based on the pertinent statutory text and is bolstered by two prior decisions of PURA and its predecessor, the Department of Public Utility Control (DPUC), that relate specifically to the project at issue and provide direct support for the conclusion that GenConn is entitled to recover its actual cost of prudently incurred debt.[1]

I hasten to add that my statutory analysis ultimately may leave GenConn in a worse position than does the result reached by the majority. Although I do not believe that, on this record, PURA has discretion to deny GenConn its prudently incurred cost of debt, the agency is not powerless to utilize other means to prevent GenConn from obtaining an unfair and unjustified return on capital. More particularly, GenConn is entitled to recover its actual, prudently incurred cost of debt, but it cannot obtain an excessive return on capital. The issue in the present case, however, is limited to whether PURA is authorized by statute to regulate GenConn's return by denying the recovery of its actual, prudently incurred cost of debt. I would answer that question "no."

The majority and I agree that the text of § 16-243u controls the outcome of this case. In relevant part, the statute provides: "From January 1, 2008, until February 1, 2008, any person may, and an electric distribution company shall, submit a plan to build peaking generation, or the electric distribution companies may submit a joint ownership plan to build peaking generation, to be heard in a contested case proceeding before the Public Utilities Regulatory Authority. . . . Any plan approved by the authority shall . . . include a requirement that the owner of the peaking generation is compensated at cost of service plus reasonable rate of return as determined by the authority . . . . *Such person* shall only recover the just and reasonable costs of construction of the facility and, *in an annual retail generation rate contested case, shall be entitled to recover its prudently incurred costs of such project, including, but not limited to, capital costs, operation and maintenance expenses, depreciation, fuel costs,*

*taxes and other governmental charges and a reasonable rate of return on equity. The authority shall review such recovery of costs consistent with the principles set forth in sections 16-19, 16-19b and 16-19e, provided the return on equity associated with such project shall be established in the initial annual contested case proceeding under this section and updated at least once every four years.* . . ." (Emphasis added.) General Statutes § 16-243u.

The only reasonable interpretation of this language entitles the generator to recover its prudently incurred cost of debt without reduction by PURA.[2] Several considerations lead me to this conclusion. First, the statute expressly provides that the generator "shall be entitled to recover its prudently incurred costs [of debt]," language that indicates a mandatory entitlement. General Statutes § 16-243u; see, e.g., *KeyBank, N.A.* v. *Yazar*, 347 Conn. 381, 392, 297 A.3d 968 (2023) (use of term "shall" in statute generally indicates mandatory requirement and will be interpreted as mandatory if prescribed action is matter of substance rather than convenience). Although "shall" can mean "may" if the statutory context reflects a permissive intention,[3] we can be certain that the legislature, in drafting § 16-243u, intended to use the word "shall" to mean something different from "may" because it used both words in the same statute in a manner demonstrating that it was acutely aware of their different meanings.[4] See, e.g., *Lostritto* v. *Community Action Agency of New Haven, Inc.*, 269 Conn. 10, 20, 848 A.2d 418 (2004).

None of this means that PURA must allow a generator to recover every documented cost of debt incurred in connection with such a project. To the contrary, § 16-243u is crystal clear that the generator is entitled to recover only "prudently incurred" costs. My disagreement with the majority lies with its conclusion that, *once costs are determined by PURA to be prudently incurred*, recovery may nonetheless be disallowed by PURA upon a finding that the costs, though prudently incurred, are somehow inconsistent with the principles set forth in § 16-19e. I read the statute to require recovery of actual costs determined by PURA to be prudently incurred. Because PURA concedes that the cost of debt at issue in the present case was actually and prudently incurred, GenConn is entitled to recover that cost as a matter of law.[5]

The majority reasons that, "[i]f PURA had no power to review the recoverable capital at these annual rate cases and was merely required to allow recovery of any cost that had already been deemed prudent, there would be no purpose for the annual review. Moreover, such a construction would render [meaningless the provision in § 16-243u requiring that] '[t]he authority shall review such recovery of costs consistent with the principles set forth in . . . [§] 16-19e' . . . ." Part I of the major-

ity opinion. This argument refers to the fact that the relevant portion of § 16-243u contains two adjacent sentences, the first entitling the generator to recover its prudently incurred costs, the second requiring PURA to review cost recovery consistent with the principles in § 16-19e.

Unlike the majority, I discern no tension that would compel us to choose between these two provisions by creating a category of prudently incurred costs under § 16-243u that nonetheless are inconsistent with (and therefore not recoverable under) the principles set forth in § 16-19e. Indeed, the majority never explains why the legislature would create such a category of costs. Nor does the majority identify any coherent principle that would justify disallowance of a cost that PURA has deemed prudently incurred within the meaning of § 16-243u. A far more cogent interpretation understands these two sentences to create a harmonious and complementary scheme under which prudently incurred costs are recoverable, with any question as to whether the costs are prudent to be resolved by PURA consistent with the principles set forth in the designated statutes. Once (as in the present case) the costs are deemed prudent, PURA can still use those principles to adjust a generator's return, so long as that adjustment permits recovery of the costs already deemed prudently incurred. This interpretation adheres most closely to the rule obligating courts to search for a construction that makes a harmonious whole of a statute's constituent parts. See, e.g., *Harpaz* v. *Laidlaw Transit, Inc.*, 286 Conn. 102, 130, 942 A.2d 396 (2008).

The majority's construction fares no better upon examination of the specific provisions of § 16-19e that it claims provide PURA the authority to deny GenConn's entitlement under § 16-243u to recover its prudently incurred cost of debt. The majority, following PURA's lead, locates PURA's authority in § 16-19e (a) (4) and (5), which authorize PURA to regulate "the level and structure of rates in accordance with the following principles . . . (4) that *the level and structure of rates be sufficient, but no more than sufficient, to allow public service companies to cover their operating costs including*, but not limited to, appropriate staffing levels, and capital costs, to attract needed capital and to maintain their financial integrity . . . [and] (5) that the level and structure of rates charged customers shall reflect prudent and efficient management of the franchise operation . . . ." (Emphasis added.)

The majority appears to assume that the applicability of these provisions to the particular circumstances of this case is self-evident, and it provides no explanation as to why or how the foregoing language allows PURA to deny recovery of GenConn's prudently incurred cost of debt under the framework established by § 16-243u. Section 16-19e (a) (4) requires PURA to ensure that the

cost recovery "be sufficient, but no more than sufficient, to allow [generators] to cover their . . . costs [of debt] . . . to attract needed capital and to maintain their financial integrity . . . ." PURA has made no finding that permitting GenConn to recover its proposed cost of debt was somehow "more than sufficient" to cover the actual cost, to attract needed capital, or to maintain its financial integrity. To the contrary, all parties agree that the cost item at issue *is* a prudently incurred cost; indeed, the record indisputably demonstrates that PURA approved the refinancing precisely because the expenditure enabled GenConn to obtain needed capital in a manner that redounded to the benefit of ratepayers as well as the generator.[6]

The same analysis applies to § 16-19e (a) (5), which articulates the principle that rates reflect the "prudent and efficient management of the franchise operation . . . ." Again, there is no suggestion that the cost of debt at issue manifested imprudent or inefficient management of the peaking generation facility. There is no claim that GenConn's actual cost of debt increased at any time after the refinancing—in fact, the cost was lower than projected[7]—and PURA concedes that the costs were prudently incurred. Rather, PURA's concern is that GenConn sought to overrecover from ratepayers because the generator applied to recover not only its actual cost of debt but also a return on equity premised on a capital structure that GenConn failed to maintain despite its obligation to do so.[8] PURA may have a legitimate grievance in this regard, and, if so, PURA would appear to have jurisdiction to remedy the problem through corrective measures that it is authorized to take with respect to GenConn's return on equity. It is clear, however, that the legislature did not intend such measures to include allowing PURA to override the express, specific provision in § 16-243u entitling the generator to recover its actual and prudently incurred cost of debt.

In my view, the single sentence in § 16-243u relied on by the majority to import the entire rate-making apparatus of § 16-19e cannot bear the heavy weight assigned to it. The provision states only that PURA shall review the generator's recovery of costs "consistent with the principles" set forth in §§ 16-19, 16-19b and 16-19e. General Statutes § 16-243u. If the legislature had intended this language to mean that, notwithstanding the specific provisions of § 16-243u expressly entitling the generator to recover its prudently incurred costs, PURA nonetheless may in its discretion disallow recovery of any such costs on the basis of the general rate-making principles set forth in § 16-19e, then it is a grossly imprecise and confusing way to express that grant of authority. I would not construe this language to encroach any more than necessary on the far more specific directive of the preceding sentence, which employs plain language to entitle the generator to

recover its prudently incurred costs.

In the same regard, it is also clear to me that the majority misapprehends the statutory scheme when it concludes that, "[i]f PURA had no power to review the recoverable capital at these annual rate cases and was merely required to allow recovery of any cost that had already been deemed prudent, there would be no purpose for the annual review." Part I of the majority opinion. This argument loses all force when we recognize that the annual review operates to consider *forecasted* costs on a *prospective* basis, as PURA made clear in the criteria decision: "[PURA] will use a forecasted rate year. All costs will be forecasted at the time of the annual rate case for the upcoming 'rate year' subject to the provisions described below." The purpose of the prospective approach is to incentivize generators to control their costs in the upcoming year. This is why the criteria decision provides that "[g]enerators will be allowed to keep any over earnings and will be at risk for any underrecovery during the rate year." The process, in other words, is premised on the fact that the contemplated costs are projected costs that have not yet been reviewed or approved by PURA as prudently incurred. To name a few, these costs will typically include operation and maintenance expenses, fuel costs, and other as yet approved costs for which the generator seeks recovery. Depending on the circumstances, the review may also include cost of debt—but not in the present case in connection with costs incurred in the 2012 refinancing, which already have been deemed to be prudently incurred.

Two decisions of PURA and its predecessor, DPUC, bolster my conclusion that GenConn is entitled to recover its prudently incurred cost of debt. See footnote 1 of this opinion. The first is the criteria decision issued by DPUC in 2007. When DPUC issued the criteria decision, the agency anticipated that generators may seek to obtain refinancing in the future and specifically addressed a generator's entitlement to recover its cost of debt after a refinancing—the context of the present case. The criteria decision assures all prospective generators as to how the agency would proceed with respect to the cost of debt incurred in connection with a refinancing: "All refinancings will be required to be approved by the [agency]. *Projects will recover the actual interest expense, subject to prudency investigation, if the actual costs exceed the costs included in their proposal.*" (Emphasis added.) I take this to confirm that the generator is entitled to recover its prudently incurred cost of debt and, in the case of a refinancing approved by the agency, that the generator will be entitled to recover the prudently incurred interest expenses associated with the refinancing, even if the cost exceeds those originally approved.

With this assurance, GenConn subsequently requested

PURA's approval to refinance the project in 2012 due to advantageous market conditions. PURA approved that request in its August 8, 2012 refinancing decision, thereby authorizing GenConn to incur the attendant costs consistent with the refinancing proposal. Gen-Conn obtained its refinancing on September 17, 2013, and PURA does not contend that the actual costs thereby incurred exceed the costs that GenConn had included in its proposal[9] or "dispute that the costs Gen-Conn incurred from its 2012 refinancing were prudent."

Second, my interpretation of the statute also finds support, ironically, in a concession made in PURA's final decision under review in this very appeal, which identifies the operative principle of cost recovery in clear and certain terms and recognizes that PURA must allow GenConn to recover its cost of debt. The final decision provides that "[a] primary component to 'just and reasonable cost-of-service compensation' [required by § 16-243u] is the return on capital employed to finance the facilities used to provide service. The return is designed to *pay interest on debt* and provide a fair return on equity." (Emphasis added.) I am unable to reconcile this acknowledgment of the statutory mandate with PURA's decision denying GenConn the funds needed to pay the interest on its debt.

It also is important to understand that GenConn's decision to refinance was highly advantageous to ratepayers. In approving the refinancing proposal, PURA observed that GenConn pledged only to execute the refinancing if it was "economically favorable to Connecticut ratepayers at the then current market conditions, *including interest costs* . . . ." (Emphasis added.) PURA further noted that GenConn's proposal was "premised on refinancing the present [l]oan [f]acility to lower costs to Connecticut ratepayers. . . . [S]ince interest rates are at historic lows, GenConn believes that it is important to refinance the [l]oan [f]acility if it can access the capital markets and or bank markets to obtain a lower rate on the proposed financing which will benefit Connecticut ratepayers." PURA itself concluded that, "based on the assumptions . . . savings [should be] produced through refinancing," and that the "approvals are in the public interest . . . ." After refinancing, GenConn submitted its compliance filing to PURA, "demonstrat[ing] that the [refinancing] resulted in a benefit to the ratepayers of approximately $23.4 million, or 85 basis points, on an all-in cost basis over the life of the debt." PURA has never contended that the refinancing was not "economically favorable to Connecticut ratepayers" as required.

There is no reason to believe that the legislature would enact legislation that would permit PURA to reverse course eight years after formally approving the refinancing and its attendant costs, and after accepting the benefits flowing to ratepayers as a result of the

refinancing. PURA knew that the refinancing required GenConn to incur interest costs, and PURA's decision to approve the refinancing necessarily means that it deemed the benefits to justify those costs. Again, PURA has never suggested otherwise and, to this day, deems those costs prudently incurred.

This interpretation of the statutory scheme also makes sense of a statute that permits private businesses to participate and compete in a newly created in-state market for the construction and operation of peaking electric generation facilities on a cost of service basis.[10] As GenConn argues, "[f]or generators to be willing to invest hundreds of millions of dollars in Connecticut's critical energy infrastructure, and for Connecticut residents to benefit from the resulting reliable electric service, generators need to have confidence that PURA will enforce the project terms set by the Connecticut legislature and PURA itself." In a single paragraph of statutory text, the Connecticut legislature assures prospective generators that they will recover their costs of service. Specifically with respect to costs recovered as part of the annual retail generation rate contested case review, the generator is assured that it is legally entitled to recover its "prudently incurred costs . . . ." General Statutes § 16-243u.

Again, my construction of the statute does not mean that PURA is without recourse if it believes that Gen-Conn seeks to recover an overall return that is excessive in light of the project's actual capital structure for the year at issue. The mechanism for addressing that concern, however, is not artificially to reduce the actual and prudently incurred cost of debt previously approved by the regulatory agency. Instead, PURA appears to be authorized by § 16-243u, consistent with the principles set forth in § 16-19b, to reduce GenConn's return on equity to reflect the project's actual capital structure in any given year. See General Statutes § 16-243u (authorizing PURA to update a generator's return on equity at least once every four years). If, as PURA contends, GenConn impermissibly altered the project's capital structure by reducing its equity investment beneath proper limits but still sought to recover a return on equity as if its capital structure remained unchanged, then PURA presumably has statutory authority to address that situation by reducing the generator's return on equity to reflect the actual capital structure, or perhaps by other means. The appropriate alternative procedures and calculations PURA properly could use, however, are not issues before the court in the present case. The issue at this time is whether PURA is authorized by § 16-243u to deny GenConn's recovery of its prudently incurred cost of debt. I would conclude that it cannot do so on this record.

For the foregoing reasons, I respectfully dissent. I would reverse the trial court's judgment and direct that

the case be remanded to PURA for further proceedings in accordance with this decision.

[1] Specifically, I rely on (1) PURA's final decision, dated December 23, 2020, on GenConn's 2021 Annual Fixed Revenue Requirements application, and (2) DPUC's criteria decision, dated December 14, 2007, setting forth how costs and debt would be reviewed by DPUC and recovered by peaking generators.

[2] Capital costs include the cost of debt. See, e.g., *Federal Power Commission* v. *Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S. Ct. 281, 88 L. Ed. 333 (1944).

[3] See, e.g., *Statewide Grievance Committee* v. *Rozbicki*, 219 Conn. 473, 480–81, 595 A.2d 819 (1991) (noting that, "in the interpretation of statutes the word shall may have a meaning that is directory rather than mandatory" and that "whether a statute is mandatory or directory [hinges on] whether the prescribed mode of action is the essence of the thing to be accomplished, or in other words, whether it relates to a matter of substance or a matter of convenience" (internal quotation marks omitted)), cert. denied, 502 U.S. 1094, 112 S. Ct. 1170, 117 L. Ed. 2d 416 (1992).

[4] The first sentence of § 16-243u illustrates the point: "From January 1, 2008, until February 1, 2008, any person *may*, and an electric distribution company *shall*, submit a plan to build peaking generation, or the electric distribution companies *may* submit a joint ownership plan to build peaking generation, to be heard in a contested case proceeding before the Public Utilities Regulatory Authority." (Emphasis added.)

[5] To be clear, I do not contend that PURA is without authority to reduce the generator's debt *rate*, so long as the generator is allowed to recover its actual and prudently incurred cost of debt for the year at issue. Thus, in the present case, I agree that PURA did not act improperly when it decided to reduce GenConn's debt rate to 5.07 percent.

[6] We can be certain that the level and structure of the rates that PURA approved in its final decision were insufficient to allow GenConn to cover its capital costs because recovery of its cost of debt was reduced below the $8,573,000 that both parties agree GenConn was required to pay to its lender in 2021. The "financial integrity" of GenConn plainly is not put at risk by allowing the cost recovery, and PURA never suggested otherwise. GenConn alleges that the opposite is true—its financial integrity was impaired by PURA's decision not to allow the cost recovery. General Statutes § 16-19e (a) (4).

[7] When GenConn completed the refinancing and sent PURA its compliance filing in 2013, the interest costs for 2021 were projected at approximately $8,908,000. These costs ultimately amounted to $8,573,000.

[8] PURA argues that denying GenConn's full cost of debt is justified because its 2021 proposal sought an excessive return on its capital (its return on debt and equity combined). In its final decision, PURA found that GenConn sought both to recover its full cost of debt and to "simultaneously earn [a return on equity] based on a different debt-to-equity ratio" than that approved by the agency or actually maintained in the project by GenConn.

[9] After refinancing, GenConn submitted its compliance filing on November 15, 2013, containing schedules of its projected interest costs from 2013 to 2041. PURA permitted GenConn to recover these interest costs each year from 2013, when the refinancing went into effect, until 2020. Only in 2021, the year presently at issue, did PURA deny GenConn's recovery of these costs.

[10] See 50 H.R. Proc., Pt. 20, 2007 Sess., pp. 6591–92, remarks of Representative Vickie Orsini Nardello.